COMMONWEALTH vs. JOSEPH A. DeCICCO.

No. 96-P-434.

Suffolk. March 13, 1997. - January 2, 1998.

Present: PERRETTA, LAURENCE, & LENK, JJ.

*Burning a Dwelling House. Joint Enterprise. Evidence,* Joint enterprise. *Malice. Practice, Criminal,* Instructions to jury, Argument by prosecutor, Assistance of counsel, Duplicative punishment. *Accessory and Principal. Statute,* Construction.

Evidence at the trial of arson indictments was sufficient to warrant the defendant's conviction either as a principal or as a joint venturer. [115-117]

At the trial of arson indictments, the judge's definition of malice did not relieve the Commonwealth of its burden of proof. [117-118]

At the trial of indictments, the prosecutor's argument to the jury connecting the defendant with certain physical evidence was a fair inference which could be drawn from the evidence. [118-119]

At a criminal trial, there was no substantial risk of a miscarriage of justice arising from the prosecutor's use in closing argument of an excluded hearsay statement referring to an argument between the victim and the defendant, where the statement was cumulative of other admissible evidence of the ongoing hostility between the defendant and the victim. [119-120]

At a criminal trial, there was no substantial risk of a miscarriage of justice arising from the prosecutor's statements in closing argument with respect to the Commonwealth's burden of proof. [120]

At a murder trial, the prosecutor's reference in closing argument to the victim's right to life did not, in the circumstances, rise to the level of a substantial risk of a miscarriage of justice. [120-121]

The cumulative effect of the prosecutor's remarks at a criminal trial, some of which were not improper and none of which were egregious or flagrant, did not reach the level of error requiring reversal of the defendant's convictions. [121]

At a murder trial in which defense counsel failed to meet a minimum standard of performance, by announcing to the jury in his opening statement that the defendant might testify without counsel's having met with the defendant to discuss his possible testimony, following which the defendant did not testify, the defendant did not demonstrate that his case was prejudiced by counsel's conduct such that he was likely deprived of an otherwise available, substantial ground of defense. [121-124]

At a murder trial, the Commonwealth's accidental loss of certain impounded

evidence did not prejudice the defendant or impair his defense, and defense counsel's failure to have inspected that evidence before trial did not deprive the defendant of an otherwise available, substantial ground of defense. [124-125]

Where a criminal defendant was convicted of second degree felony-murder with arson as the underlying felony, the defendant's conviction and sentence on an arson indictment was duplicative. [125]

A conviction on a charge brought under G. L. c. 266, § 102A, for possession of an infernal machine, was duplicative of a conviction under G. L. c. 266, § 102, for the wilful throwing of explosives at or near persons or property. [125]

This court concluded that the legislative intent embodied in the arson statute, G. L. c. 266, § 1, as amended by St. 1974, c. 281, is a prosecution for each dwelling house caused to be burned, with the result that the burning of a dwelling that spread to a second dwelling adjacent could properly be prosecuted in two indictments for arson. [126-128]


INDICTMENTS found and returned in the Superior Court Department on January 26, 1994.

The cases were tried before *Constance M. Sweeney*, J.

*Wendy Sibbison* for the defendant.

*Eric Neyman*, Assistant District Attorney, for the Commonwealth.

PERRETTA, J. On the early morning of January 16, 1994, an incendiary bomb, commonly called a "Molotov cocktail," was thrown through the window of a wood frame house. Before the resulting fire was extinguished, one of the occupants of the house was dead, three firemen injured, and two houses damaged. The defendant and George Madden were ultimately charged with all the crimes associated with the fire. Each gave the police a statement claiming that the other had thrown the bomb. The defendant was tried separately and found guilty on the many indictments against him, including second degree murder on a felony-murder theory and two counts of arson.[1, 2] On appeal, he complains about the denial of his motions for

---

[1]The defendant was also found guilty on indictments charging him with assault with a dangerous weapon (an open flame), G. L. c. 265, § 15B(*b*); three counts of injury to a firefighter, G. L. c. 265, § 13D½; possession of an infernal machine, G. L. c. 266, § 102A; possession of an illegal container of flammable liquid, G. L. c. 266, § 102B; and possession of an explosive device with intent to destroy or damage property, G. L. c. 266, § 102.

[2]Eleven months after the defendant's trial, George Madden pleaded guilty to manslaughter, armed assault with intent to murder, two counts of arson, and at least one count of injury to a firefighter.

required findings of not guilty, the jury instructions, the prosecutor's closing argument, the representation provided by his attorney,[3] and the imposition of duplicative sentences. We vacate two of the defendant's convictions and affirm the remaining judgments.

1. *The evidence.* We recite the evidence in the light most favorable to the Commonwealth. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-678 (1979). Robert Hilliard (Hilliard) lived at 228 Bellingham Avenue, Revere, with his son Wayne. The defendant and George Madden lived in separate units at the same apartment complex which was located at 188 Bellingham Avenue.

Hilliard and the defendant met in 1993, and thereafter saw each other on an almost daily basis. Hilliard would buy cocaine which he would share with the defendant and the defendant's friends, including George Madden, at his apartment. By December of 1993, Hilliard had exhausted his savings on the drug and decided that he had to stop using it. When he told the defendant that there would be no more cocaine, the defendant began to pressure him with telephone calls and visits to his house. He would bang on Hilliard's front door, he threw a brick through one of Hilliard's windows, he entered Hilliard's porch and destroyed all his effects with a shovel, and he repeatedly threatened to harm or to kill Hilliard. The defendant and Madden went to Hilliard's home together on numerous occasions to attempt to persuade him to supply them with cocaine. By the end of December, after the defendant had threatened to kill him, Hilliard kept a loaded shotgun nearby at all times.

On January 16, 1994, a neighbor of Hilliard's was preparing for bed. As she went to pull down her window shade, she saw a man "put a light in [Hilliard's] sun parlor window [and] it gradually grew larger, and then there was an explosion." She was unable to identify the person that she saw.

Hilliard testified that it was about 12:35 A.M. when he was awakened by his son who was screaming that the house was on fire. The entire porch was in flames. The fire spread quickly, shooting "right across the ceiling just like a river of flames, the heat and the pressure and the smoke." Both men struggled to escape. Hilliard was able to jump from a window to the ground twelve feet below. His son could not get out of the house, and he died from "acute carbon monoxide poisoning."

---

[3]Appellate counsel did not represent the defendant at trial.

The defendant was among a group of neighbors who were watching the fire. He was wearing a nylon jogging suit and carrying a bottle of wine. He was visibly intoxicated. A Revere police officer placed the defendant in protective custody and arranged for his transportation to the police station. Upon returning to the crowd watching the fire, the officer received information from bystanders concerning Madden. He too was intoxicated and taken into protective custody.

Over twelve hours after being taken into custody, Madden and the defendant made statements in which each accused the other of starting the fire. Madden's version of events was as follows. The defendant came to his apartment asking for some beer. At some point, Madden went out and purchased a bottle of wine. As he and the defendant sat in the apartment drinking the wine, the defendant stated that he wanted to throw a fire bomb at Hilliard. Madden, describing himself as "feeling good" at that point, told the defendant to do it even though he, Madden, didn't know how to make a fire bomb. The defendant then told Madden that he had something in the cellar and that Madden should follow him. They went to the basement, and Madden watched the defendant go into the boiler room and return with a tube filled with liquid.

Although Madden first told the police that he gave the defendant a rag which the defendant put in the tube, he later stated that he put the rag, a white face cloth from his kitchen, in the tube. When he did so, some of the liquid squirted out. Madden stated that he next placed three matches around the top of the tube. He told the police that he gave the defendant the matches because he asked for them and that the entire matter was the defendant's idea. Once the device was made, Madden and the defendant left the building and started out for Hilliard's house. Madden, who was wearing a white hat and coat, stayed about fifteen yards behind the defendant. When he saw the defendant light the matches and throw the tube, he quickly returned to his apartment. The defendant came back within a minute or two and told Madden that he was going to go back to watch the fire. ·

Accusing Madden, the defendant told the police that he was at Madden's apartment, that they had been drinking beer and wine, and that Madden said he had some "crack" pipes with leftover resin in them. The defendant offered to clean the pipes with methanol so that he and Madden could then smoke the

resin. He took a small glass spice jar from Madden and went to the basement. There he filled the jar from a fifty-five gallon drum of methanol. When he returned to Madden's apartment, Madden took the jar and said he was going to set a fire at Hilliard's property. He put a rag and matches in the bottle. The defendant did not believe Madden actually intended to start a fire, and he did not really want to argue with him: Madden was "buying the beer and he had the pipes and the resins."

When Madden left the apartment, the defendant thought that he was "just going to go around the corner and throw it somewhere." Madden returned and told the defendant that he had thrown the bomb and asked him to tear up his hat and throw it away. The defendant told the police that he did as Madden asked, throwing the hat away in the back yard.

The defendant acknowledged that the methanol was his and explained to the police that he used it on his sister's car as an octane booster. He also acknowledged that he had had arguments with Hilliard and that he had broken his window. According to the defendant, those arguments concerned the fact that Hilliard was "beating on girls."

2. *Sufficiency of the evidence.* The defendant's argument concerning his motions for a required finding of not guilty concentrates on the sufficiency of the evidence in respect to the underlying felony, arson: If the evidence is insufficient to show his arson of Hilliard's house, his conviction for the murder of Wayne Hilliard cannot stand. To sustain its burden of proof on the arson charges against the defendant, the Commonwealth was required to prove beyond a reasonable doubt that he, acting alone or in a joint venture with Madden, set fire to a dwelling house or that he aided, counseled, or procured the burning of that dwelling house.

Although there was sufficient evidence (Madden's statement to the police and his testimony at trial) to show that the defendant was a principal in the arson, the defendant argues that the evidence failed to show his participation in the fire as a joint venturer. Further, the argument continues, the defendant was not indicted as an accessory before the fact and even had he been so charged, the evidence of his accessorial participation was insufficient. The conclusion to the argument is that because it cannot be ascertained upon which theory of guilt the general verdict is based (principal, joint venturer, or accessory) the arson and felony-murder convictions cannot stand.

Relying upon *Commonwealth* v. *Green,* 420 Mass. 771, 780 (1995), the defendant argues that because the only evidence of his presence at the fire came from Madden who placed him there as a principal, a "rational jury would not be warranted in inferring that he was not the principal, but was present at the scene as the joint venturer." *Green* is, however, distinguishable on its facts. There were two witnesses in *Green* who saw two men at the scene of a murder. Only one of the two witnesses established that the defendant was one of the two men and that same witness "unequivocally identified the defendant as the shooter." *Ibid.* In concluding that the jury would not be warranted in inferring that the defendant was not the principal but was present as a joint venturer, the court explained: "Such an inference would be speculative and highly unreasonable, because the evidence in this case solely pointed to the defendant's role as the principal. Cf. *Commonwealth* v. *Daughtry,* 417 Mass. 136, 139-140 (1994) (no error in charging jury on joint venture where Commonwealth offered evidence from which jury could infer that either defendant or accomplice fired fatal shot)." *Commonwealth* v. *Green,* 420 Mass. at 780-781.

It is the defendant's position that the Commonwealth's proof of joint venture fails on the required element of the defendant's presence at Hilliard's house when the fire was started. We think, however, that the jury could have reasonably concluded that Madden lied to protect himself in stating that he did not throw the firebomb, and then reasonably believed his other testimony concerning the events immediately before and after the fire. See *Commonwealth* v. *Daughtry,* 417 Mass. at 140 n.1.

Even if the jury concluded that Madden went to Hilliard's house alone, they would not have been precluded from finding that the defendant was a joint participant in the arson. "A defendant may also be convicted as a joint participant in a felony if the defendant 'aids in the commission of a felony, or is an accessory thereto before the fact by counselling, hiring or otherwise procuring such felony to be committed.' G. L. c. 274, § 2. *Commonwealth* v. *Raposo,* 413 Mass. 182, 184-185 (1992). See J.R. Nolan & B.R. Henry, Criminal Law § 633, at 521-523 (2d ed. 1988)." *Commonwealth* v. *Ortiz,* 424 Mass. 853, 856 (1997), and cases collected therein at n.4.

That the arson indictment against the defendant charged only that he "wilfully and maliciously did set fire to and burn a

dwelling house" did not preclude the Commonwealth from satisfying its burden of proof by showing that he did aid, counsel, or procure the burning of a building. As stated in *Commonwealth* v. *DeStefano*, 16 Mass. App. Ct. 208, 215 (1983):

> "General Laws c. 266, §§ 1 and 10, do not differentiate between those who wilfully and maliciously set fire to, burn or cause the burning of the subject building and those who aid, counsel or procure the burning. A finding of guilty of arson can be predicated upon a finding that the defendant either directly participated in the burning or aided, counseled or procured another to do it, even though the fact finder may not be able to determine which type of misconduct actually occurred. Put another way: it is enough to support a conviction if it can be determined, beyond a reasonable doubt, that one of these forms of misconduct must have occurred, although the fact finder cannot say with certainty which one."

See *Commonwealth* v. *Ortiz*, *supra* at 857, wherein it is noted that St. 1973, c. 529, §§ 1 and 2, amending G. L. c. 274, §§ 2 and 3, had the effect of "abrogat[ing] the distinction between principals and accessories before the fact."

3. *Instructions on malice.* To convict the defendant of arson as a principal, the Commonwealth was required to prove that he wilfully and maliciously set Hilliard's house on fire. In charging the jury on malice, the trial judge stated: "Malice characterizes all acts done with an evil disposition, a wrong or unlawful motive or purpose. The willful doing of an injurious act without excuse constitutes malice. Malice may be inferred from the willful act of burning without justification."

This definition of malice did not, as the defendant argues, relieve the Commonwealth of its burden of proof by creating an impermissible mandatory presumption such as that struck down in *Commonwealth* v. *Zezima*, 387 Mass. 748, 751-753 (1982). Rather the definition tracks the instruction discussed in *Commonwealth* v. *Niziolek*, 380 Mass. 513, 527 (1980). See *Commonwealth* v. *Ely*, 388 Mass. 69, 74 (1983); *Commonwealth* v. *Mezzanotti*, 26 Mass. App. Ct. 522, 528-529 (1988).

The defendant also complains that the trial judge's instructions on the crime of accessory before the fact to arson erroneously removed malice as an element. In charging the jury on

this theory of arson, the trial judge stated: "Under this theory . . . it is not necessary for the Commonwealth to prove the defendant was the person who actually set [the] fire, nor does the Commonwealth have to prove that the defendant acted willfully or maliciously. Rather, under the second theory of arson, the Commonwealth must prove that the defendant assisted or advised or procured a person to burn a dwelling house or a building and that such person actually burned the dwelling house. . . ."

This instruction was a correct statement of the law. The Commonwealth need not prove that an accessory before the fact to arson acted wilfully or maliciously, only that the principal did. See *Commonwealth* v. *Bloomberg*, 302 Mass. 349, 355 (1939); Nolan & Henry, Criminal Law § 424 (2d ed. 1988). The trial judge's instructions did not prevent the jury from considering evidence of the fact that the defendant told the police that he did not believe that Madden was actually going to do as he said and burn Hilliard's house. When the jury specifically asked whether an accessory's assistance could be "inadvertent," the trial judge responded: "[N]o. The assistance has to be purposeful. The person must know they are aiding, counseling, assisting, or advising the other person with respect to the burning of a building. . . ."

4. *The prosecutor's closing argument.* There are numerous statements in the prosecutor's closing argument which, taken separately or cumulatively, the defendant claims require reversal of his convictions. The first concerns a teal and black checked jacket which the police found, along with a hat, behind the defendant's and Madden's apartment building the morning after the fire. The jacket was subjected to scientific testing which revealed the presence of methanol on the sleeve.

There was testimony from which the jury could have found that the jacket belonged to Madden and that the methanol got on the sleeve when he inserted the rag into the tube or bottle. No one, however, testified to seeing the defendant with the jacket before, during, or after the fire. The prosecutor nonetheless argued that the jury could connect the jacket to the defendant by inferring that he borrowed it from Madden to wear when he went out to throw the firebomb: "Who was the only one walking around in the freezing weather with a jogging suit on? Is there any doubt why? Because he threw [the jacket] away. He was the one that threw this away. You could even say

maybe he borrowed it, maybe he borrowed it from George's apartment and wore it when he went out to do the Molotov; but he's the one that threw it away, the only one without a jacket. Why? Because he just got rid of it. That's why." The defendant claims that it was impermissible for the prosecutor to argue that the defendant had worn the jacket.

Although there was no direct evidence to show that the defendant was wearing the jacket in dispute, there was evidence to show that Madden was not. There was also evidence to show that the jacket belonged to Madden, that Madden and the defendant were in Madden's apartment prior to the fire, that the defendant changed his clothes before going with Madden to Hilliard's house to watch the fire, that the defendant watched the fire while wearing only a nylon jogging suit in freezing weather, and that the jacket was found in close proximity to the hat which the defendant admitted to having thrown in the back yard. We think the prosecutor's statement a fair inference which could be drawn from the evidence. See *Commonwealth* v. *Lamrini*, 392 Mass. 427, 431 (1984), and cases therein cited.

The defendant next argues that the prosecutor improperly argued to the jury that the defendant stood outside Hilliard's house about two hours before the fire and argued with Wayne. The defendant claims that the prosecutor's argument was based upon evidence to which the trial judge sustained an objection and which she ordered the jury to disregard: When Hilliard testified that, as he and Wayne were trying to flee from the burning house, Wayne was screaming that he had a "beef with DeCicco . . . a little earlier."

Because Hilliard had testified moments earlier to his son's statement without objection, the Commonwealth argues that there was a basis in the evidence for the remark made by the prosecutor in his closing. In light of the trial judge's ruling and order on the almost immediately repeated testimony, we decline to resolve the defendant's claim on the basis urged by the Commonwealth.[4] Instead, we conclude that the reference to an earlier argument between Wayne and the defendant did not create a substantial risk of a miscarriage of justice.

---

[4]The Commonwealth also argues that the trial judge's ruling was erroneous and that Wayne's statement to his father was admissible under the spontaneous utterance exception to the rule against hearsay. See *Commonwealth* v. *Grant*, 418 Mass. 76, 81-82 (1994); *Commonwealth* v. *Capone*, 39 Mass. App. Ct. 606, 609-610 (1996). This argument could and should have been made at

Numerous witnesses testified to ongoing hostility between Hilliard and the defendant and Madden. There was also testimony from Hilliard's neighbor that about two hours before the fire, she heard an argument between someone inside Hilliard's house and two men standing outside. She described the argument as of the same kind that was always taking place in front of Hilliard's house. In light of this testimony, we conclude that the prosecutor's reference to Wayne's excluded statement does not require reversal of the defendant's convictions.

Nor is reversal required because of the prosecutor's statement that the defendant "has a right to just sit there and make us prove our case." That statement immediately followed the prosecutor's acknowledgment that the Commonwealth bears the burden of proof in a criminal case. We do not accept the defendant's characterization of the statement as a "not-so-oblique" reference to the fact that the defendant did not testify. Further, the statement was entirely consistent with the trial judge's instructions on the Commonwealth's burden of proof and the defendant's presumption of innocence, about which the defendant makes no complaint.

We also think that the prosecutor's observation that the Commonwealth's burden of going forward provided the defendant with "an opportunity to move around" the evidence, made in the context of specific examples of fabrication drawn from his statements to the police, could not be construed reasonably by the jury as an invitation to draw an inference adverse to the defendant based upon a failure to testify. Even if the remark is thought close to the outer limit of permissible argument, we nonetheless conclude that it does not present a substantial risk of a miscarriage of justice.[5] See *Commonwealth* v. *Sherick*, 401 Mass. 302, 304-305 (1987); *Commonwealth* v. *Moore*, 408 Mass. 117, 129-132 (1990).

In concluding his argument, the prosecutor asked the jury to

the time of the trial judge's ruling rather than on appeal as justification for not abiding by her order.

[5] The trial judge instructed the jury: "The presumption of innocence also means that no person need ever prove anything to this Court. The one with the burden of proof is the Commonwealth. The defendant has no burden of proof whatsoever and has no obligation to testify on his own behalf. You may not in any way, shape, or form draw any inference favorable or unfavorable to or against the defendant as a result of his election not to testify in this case. That brings us four square, then, to the other principle, fundamental principle of our system, and that is proof beyond a reasonable doubt."

remember that while the defendant had legal rights, Wayne Hilliard had the right to life. The defendant claims that by this statement the prosecutor achieved his intended goal, that is, "to inflame the jurors' hostility toward the defendant's rights — thus undercutting the presumption of innocence — and to promote sympathy for the victim." We do not think this reference to the victim's right to life rises to the level of a substantial risk of a miscarriage of justice. The prosecutor managed to refrain from exploiting the manner of the victim's death, compare *Commonwealth* v. *Smith*, 387 Mass. 900, 909 (1983), and the trial judge instructed the jury that their decision "cannot and must not in any way be influenced by sympathy or by emotion or by prejudice." See *Commonwealth* v. *Palmariello*, 392 Mass. 126, 135 (1984).

We are also urged by the defendant to consider the cumulative effect of the prosecutor's statements. "In evaluating the effect of the prosecutor's improper statements, we must determine 'whether the argument as a whole is prejudicial in light of all the circumstances, including the nature of the evidence, the persistence or flagrancy of the remarks, and the instructions of the judge.' " *Commonwealth* v. *Clary*, 388 Mass. 583, 590-591 (1983), quoting from *Commonwealth* v. *Dougan*, 377 Mass. 303, 312 (1979). As noted, some of the prosecutor's statements were not even improper. Others were perilous but none was egregious or flagrant. Taking them in combination, we conclude that the prosecutor's closing argument did not reach the level of error requiring reversal of the defendant's convictions.

5. *Ineffective assistance of counsel.* Delivering his opening statement at the close of the Commonwealth's evidence, defense counsel presented the jury with a "road map," that is, a statement telling "where we're heading." He then told the jury that they would be hearing from several witnesses, neighbors, who would describe the relationship between Hilliard and Madden and the defendant as well as what they saw prior to and at the time of the fire. He also stated: "It is anticipated that Mr. DeCicco will take the stand. He, as you know, doesn't have to, but right now I think that — I believe he will be taking the stand. . . ." Defense counsel then went on to relate that any testimony by the defendant would "be very similar to the transcript [of the defendant's statement to the police] that has been substantially read into the record by me with the cross examination of Trooper Cox."

Although defense counsel did present several neighbors as witnesses, the defendant did not testify and defense counsel concluded his case the day after his opening.

We need not consider whether defense counsel's statement to the jury, that the defendant might testify, was based upon a manifestly reasonable strategic decision. See *Commonwealth* v. *Nardone*, 406 Mass. 123, 126 (1989), and cases therein cited. The record reflects that the reason defense counsel decided that the defendant would not testify is that he did not have an opportunity to meet with the defendant and discuss his testimony. However, the record also reflects that prior to making his opening statement, defense counsel had ample opportunity, a weekend, to meet with the defendant but did not do so.[6]

Defense counsel failed to meet a minimum standard of performance by announcing to the jury that the defendant might testify without first having met with him to discuss that possibility and to prepare him for it. See *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). Compare *Commonwealth* v. *Underwood*, 36 Mass. App. Ct. 906, 907 (1994), where defense counsel told the jury that a witness whom he had interviewed would testify but thereafter, because of the defendant's unexpected, potentially conflicting testimony, chose not to present the witness. That conclusion does not, however, end the matter. We must next determine whether the defendant "has also shown that, but for counsel's error, something material might have been accomplished in the defendant's favor (*Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 [1977]). See *Strickland* v. *Washington*, 466 U.S. 668, 687 (1984), describing the standard for testing the ineffectiveness of counsel under the Constitution of the United States (which we have said is a standard no more favorable to a defendant than that under the State Constitution. *Commonwealth* v. *Fuller*, 394 Mass. 251, 256 n.3 [1985])." *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992).

Relying upon *Anderson* v. *Butler*, 858 F.2d 16 (1st Cir. 1988), the defendant argues that his trial counsel's failure to deliver powerful and promised testimony was prejudicial as matter of law. We think *Anderson* readily distinguishable. There the

---

[6]In requesting that the trial judge include in her final instructions a direction to the jury that they were to draw no inference from the defendant's failure to testify, defense counsel cited his opening statement and his inability to meet with the defendant.

defendant was on trial for murder in the first degree and the lesser included offenses of murder in the second degree and manslaughter. The question of his state of mind was an issue before the jury. Defense counsel represented in his opening statement, made at the close of the Commonwealth's case, that he would call a psychiatrist and a psychologist whose testimony would show that the defendant was "walking unconsciously toward a psychological no exit" and that on the night in question he was like a "robot programmed on destruction." *Id.* at 17. These statements were made on the basis of the witnesses' reports which defense counsel had in his possession. Although the witnesses were available to testify, they were not called.[7] Additionally, defense counsel never abandoned the defendant's mental condition as a defense, and his failure to present the witnesses "substantially damaged the very defense he primarily relied on." *Id.* at 19. The First Circuit reasoned: "The promise was dramatic, and the indicated testimony strikingly significant. The first thing that the ultimately disappointed jurors would believe, in the absence of some other explanation, would be that the doctors were unwilling, viz., unable, to live up to their billing. This they would not forget." *Id.* at 17. It was these circumstances which led the court to conclude that "to promise even a condensed recital of such powerful evidence, and then not produce it," *id.* at 19, was prejudicial as matter of law.

In the present case, defense counsel's statement, that the defendant might testify, was far from a dramatic promise. Additionally, defense counsel informed the jury that any anticipated testimony by the defendant would substantially track his statements to the police which they had already heard from Trooper Cox and a copy of which was in evidence. Although the defendant claims prejudice from an unspoken inference, that he "did not dare to repeat his statement . . . under the pressure of cross-examination under oath," the trial judge forcefully instructed the jury that no such inference could be drawn. See note 5, *supra.* We presume, as we must, that this instruction was followed. See *Commonwealth* v. *Helfant*, 398 Mass. 214,

---

[7]After the defendant's conviction was affirmed on the basis that defense counsel's decision not to present expert testimony was a "tactical one that was not 'manifestly unreasonable,' when made," *Commonwealth* v. *Anderson*, 398 Mass. 838, 844 (1986), he filed a petition for a writ of habeas corpus in the United States District Court for the District of Massachusetts. When that was denied, he appealed to the Court of Appeals.

228-229 (1986), and cases therein cited. In these circumstances, we conclude that the defendant's case was not "prejudiced by counsel's conduct such that the conduct 'has likely deprived the defendant of an otherwise available, substantial ground of defence.' " *Commonwealth* v. *White*, 409 Mass. 266, 272 (1991), quoting from *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974).

Prior to trial, defense counsel brought a motion to impound "any real evidence" seized by the police in the investigation of the fire. Although that motion was allowed, defense counsel took no action relative to any impounded evidence until his cross-examination of Trooper Cox, when he asked that the teal and black jacket be produced. The Commonwealth could not find the jacket.

It is the defendant's argument on appeal that because defense counsel failed to inspect the jacket prior to trial, he lost the opportunity to determine whether it even fit the defendant. If the jacket were shown to be too small for the defendant, then the prosecutor could not have argued to the jury that they could find the defendant guilty as a principal by inferring that he borrowed the jacket from Madden when he went out to throw the firebomb at Hilliard's house.[8]

Assuming without deciding that defense counsel's failure to inspect the impounded evidence prior to trial was conduct "falling measurably below that which might be expected from an ordinary lawyer," *Commonwealth* v. *Saferian, supra* at 96, we conclude that it is not likely that the failure "deprived the defendant of an otherwise available, substantial ground of defence," *ibid.*, for the following reason:

> "In this Commonwealth, when potentially exculpatory evidence is lost or destroyed, a balancing test is employed to determine the appropriateness and extent of remedial action. The courts must weigh the culpability of the Commonwealth, the materiality of the evidence and the potential prejudice to the defendant."

*Commonwealth* v. *Willie*, 400 Mass. 427, 432 (1987). See *Commonwealth* v. *Olszewski*, 416 Mass. 707, 716 (1993), cert. denied, 513 U.S. 835 (1994).

Trooper Cox testified that when accelerant was detected on

---

[8]Whether the jacket fit the defendant would be irrelevant to the issue of his guilt as an accessory to or a joint participant in the arson.

one of the sleeves on the jacket found in the yard, that sleeve was cut from the jacket and sent for testing. It also appears from the record that numerous articles of clothing taken from Madden and the defendant were believed to be in a box which was searched upon defense counsel's request that it be produced. There is nothing to show whether the remainder of the jacket was ever put in that box and, if so, what thereafter happened to it. No one could say. Although it appears that the Commonwealth is responsible for the loss of the jacket, there is nothing in the record which even suggests that the loss of the jacket was intentional or due to bad faith. See *Commonwealth v. Charles*, 397 Mass. 1, 14 (1986).

Any materiality of the jacket is found in the fact that had it been shown not to fit the defendant, the prosecutor would not have asked the jury to infer that the defendant had borrowed the jacket to go out and throw the firebomb. But the sufficiency of the Commonwealth's proof of the defendant's guilt as a principal, see note 8, *supra*, did not depend upon the availability of that inference. There was Madden's testimony.

Moreover, we see little, if any, prejudice to the defendant as a result of the loss of the jacket. The jury saw both Madden and the defendant in the course of the trial. If there was such disparity in size between the two men to preclude any reasonable inference that the defendant had worn Madden's jacket, it would have been obvious to the jury and to defense counsel.

Any failure by defense counsel to inspect the physical evidence prior to trial did not impair the defense and, therefore, does not require reversal of the defendant's convictions.[9]

6. *Multiple punishments.* We agree with the defendant that the conviction on the charge of arson of Hilliard's house must be vacated as that arson is a lesser included offense of second degree murder on a felony-murder theory. See *Commonwealth v. Mello*, 420 Mass. 375, 398 (1995). We also agree that the conviction on the charge brought under G. L. c. 266, § 102A, possession of an infernal machine, must be vacated as it is duplicative of the conviction on the indictment charging the wilful throwing of explosives at or near persons or property.

---

[9]We need not discuss the defendant's remaining claims against defense counsel, that he was ineffective in failing to object to various "significant judicial and prosecutorial errors," because elsewhere in this opinion we have concluded that the various rulings and statements which form the basis of this argument were not erroneous.

See G. L. c. 266, § 102. See *Kuklis* v. *Commonwealth*, 361 Mass. 302, 306-307 (1972). The more difficult question, however, is whether the burning of the dwelling adjacent to Hilliard's was a separate, second arson or a continuation of the first.

"[W]here a single statute is involved and the issue is whether two or more discrete offenses were proved under that statute rather than a single continuing offense," Smith, Criminal Practice and Procedure § 1320 (Supp. 1997), the question becomes whether the Legislature intended to authorize more than one conviction. See *Commonwealth* v. *Levia*, 385 Mass. 345, 347-351 (1982) (two armed robbery convictions appropriate where defendant held gun to two store employees and took money belonging to store). Compare *Commonwealth* v. *Donovan*, 395 Mass. 20, 29-31 (1985) (defendants who, on one night and at one bank, placed a false night deposit box into which seven deposits were made committed one larceny pursuant to a single larcenous scheme).

As pertinent to the instant case, the question is whether the Legislature, in enacting G. L. c. 266, § 1, intended that the unit of prosecution be each dwelling house burned in the course of the fire. We have found no Massachusetts case that addresses the problem of multiple punishments in the context of arson. In seeking to ascertain legislative intent, we look first to the words of the statute. General Laws c. 266, § 1, as amended by St. 1974, c. 281, provides:

> "Whoever wilfully and maliciously sets fire to, burns, or causes to be burned, or whoever aids, counsels or procures the burning of, a dwelling house, or a building adjoining or adjacent to a dwelling house, or a building by the burning whereof a dwelling house is burned, whether such dwelling house or other building is the property of himself or another and whether the same is occupied or unoccupied, shall be punished by imprisonment in the state prison for not more than twenty years, or by imprisonment in a jail or house of correction for not more than two and one half years, or by a fine of not more than ten thousand dollars, or by both such fine and imprisonment. The words 'dwelling house,' as used in this section, shall mean and include all buildings used as dwellings such as apartment houses, tenement houses, hotels, boarding houses,

dormitories, hospitals, institutions, sanatoria, or other buildings where persons are domiciled."

Section 1 differs from common law arson in two respects. Firstly, the statute includes within its terms the burning of one's own dwelling. See Nolan & Henry, Criminal Law § 423 (1988); 3 Torcia, Wharton's Criminal Law § 350 (14th ed. 1980). Secondly, one building containing many dwelling units falls within the definition of a "dwelling house" in § 1, whereas at common law, each unit is a separate dwelling. See Perkins & Boyce, Criminal Law 257 (3d ed. 1982).

Notwithstanding these differences, the Legislature engrafted in § 1 the common law understanding of arson. Common law arson, the burning of one's place of residence, is a heinous, life-threatening crime:

> "This is an offence of very great malignity, and much more pernicious to the public than simple theft: because, first, it is an offence against that right, of habitation, which is acquired by the law of nature as well as by the laws of society; next, because of the terror and confusion that necessarily attends it; and lastly, because in simple theft the thing stolen only changes it's [*sic*] master, but still remains in *esse* for the benefit of the public, whereas by burning the very substance is absolutely destroyed. It is also frequently more destructive than murder itself, of which too it is often the cause; since murder, atrocious as it is, seldom extends beyond the felonious act designed, whereas fire too frequently involves in the common calamity persons unknown to the incendiary, and not intended to be hurt by him, and friends as well as enemies."

4 Blackstone, Commentaries * 220. See 3 Torcia, Wharton's Criminal Law § 345 (14th ed. 1980) ("in burning a dwelling house, the defendant manifests a contempt for human life").

In light of the fact that the Legislature chose not to depart from the essence of the common law crime of arson in enacting § 1, we conclude that the intended unit of prosecution of the offense of arson is each dwelling house or each building used as dwellings as defined in the statute. It follows that the two arson indictments against the defendant were permissible. See *Commonwealth* v. *Donovan, supra* at 31 ("Whenever a single criminal transaction gives rise to crimes of violence which are

committed against several victims, then multiple indictments [and punishments] are appropriate"). In the event that this conclusion, that a single fire can lead to multiple indictments, leads to prosecutorial excess, those safeguards discussed in *Commonwealth* v. *Levia, supra* at 351, are available.[10]

Accordingly, the case is remanded to the Superior Court. The judgments on the convictions on the indictments charging arson of Hilliard's house and possession of an infernal machine under G. L. c. 266, § 102A, are to be vacated and the verdicts set aside. The remaining judgments are affirmed.

*So ordered.*

---

[10]We need not reach the question whether an alternative basis for our conclusion exists in *Commonwealth* v. *Cameron,* 385 Mass. 660, 670 (1982) ("The burning of the adjacent building was a separate offense, requiring proof of an additional element").