## COMMONWEALTH vs. GREGORY W. CARTER.

No. 02-P-1391.

Plymouth. January 12, 2004. - May 21, 2004.

Present: LAURENCE, BROWN, & BERRY, JJ.

Further appellate review granted, 442 Mass. 1103 (2004).

*Infernal Machine.*

At the trial of an indictment charging the defendant with possession of an infernal machine, in violation of G. L. c. 266, § 102A, as amended by St. 1970, c. 422, the Commonwealth's evidence that the defendant stored a brick-shaped block of C-4 plastic explosive in one drawer of a two-drawer metal cabinet, and blasting caps nearby in a separate plastic container, was not sufficient to establish that the defendant possessed an infernal machine. [207-215]

INDICTMENT found and returned in the Superior Court Department on March 3, 2000.

The case was tried before *Nonnie S. Burnes*, J.

*Jane Larmon White*, Committee for Public Counsel Services, for the defendant.

*Gail M. McKenna*, Assistant District Attorney, for the Commonwealth.

LAURENCE, J. In an era plagued by daily homicidal bomb attacks somewhere in the world, it provides perspective, if not comfort, to note that our concerns about such criminal activity are not unprecedented. The Massachusetts Legislature felt compelled to enact a statute proscribing the possession of "any bomb or other high explosive," see G. L. c. 148, § 35, as early as 1847 when it gave cities and towns the power to regulate substances used as explosives, St. 1847, c. 51; and in 1930 saw the need for a separate statute criminalizing the possession of any "infernal machine . . . includ[ing] any device for endangering life or doing unusual damage to property, or both, by explosion" (now G. L. c. 266, § 102A, as amended by St. 1970,

c. 422). The defendant, Gregory W. Carter, here challenges his May, 2001, conviction for violating § 102A, contending that the Commonwealth's evidence fell short of proving that what he possessed constituted an infernal machine.

Carter's conviction resulted from the following circumstances. Dissatisfied with various aspects of a residential property he had purchased from one Michael Neilson, Carter issued several threats against Neilson for failure to redress the problems Carter perceived. The threats included attacking Neilson with a substance Carter boasted he possessed, identified as "C-4 plastic explosive," and blowing up Neilson's house. After Carter physically confronted Neilson in the latter's home with (according to Neilson) a long knife and renewed threats of similar nature, the local police intervened at Neilson's behest. They arrested Carter and searched his property (pursuant to a warrant) for the C-4 explosive he claimed to possess. In the course of the search, police officers found marijuana plants growing outside of Carter's house. In one drawer of a two-drawer metal cabinet outside the master bedroom, they discovered a "brick-shaped" block of C-4 explosive in a nylon bag, as well as a small plastic container holding ten percussion blasting caps. The container holding the blasting caps was located in a different part of the drawer, separated from the block by tools and other items.[1]

Carter was indicted for armed home invasion, armed assault with intent to murder, unlawful cultivation of marijuana, and (most pertinent to this appeal) possession of an infernal machine. A Superior Court jury acquitted him of armed home invasion and armed assault with intent to murder, but convicted him of unlawful cultivation of marijuana and possession of an infernal machine. Carter's main argument on appeal[2] is that the trial judge erred in denying his motion for a required finding of not guilty on the infernal machine possession charge because the Commonwealth's proof failed to establish that he possessed an infernal machine within the meaning of G. L. c. 266, § 102A.

Carter contends that the Commonwealth needed to prove that

---

[1] The record does not provide the dimensions of either the metal cabinet or the drawer in which the C-4 explosive and blasting caps were found.

[2] Carter does not challenge his arrest, the search of his property, or his marijuana conviction on appeal.

he was in possession of a fully-assembled machine or device rather than merely the separate component parts (C-4 explosive and blasting caps) found in his drawer which had not yet been sufficiently integrated to constitute an infernal machine that could destroy or injure by fire or explosion. The Commonwealth counters that the statute contains no requirement that the forbidden device be fully assembled and ready to detonate, and it need merely be potentially destructive whenever combined, relying on the language in the next-to-last sentence, "whether or not contrived to ignite or explode automatically."

General Laws, c. 266, § 102A (set out in its entirety in the margin[3]), did not generate any legislative history clarifying its intent and scope. It remains sui generis[4] and has been discussed little in appellate opinions.[5] Contrary to both parties' shared underlying assumption that the statutory language is clear, exactly what is to be understood by the quaintly archaic term "infernal machine" is not comprehensible to a person of ordinary intelligence simply by reading the statute. Although it appears in dictionaries, the term is not one encountered in everyday usage.[6] It is undefined in § 102A, which merely purports to provide examples of the kind of "machine" or

---

[3]"Whoever, other than a police or other law enforcement officer acting in the discharge of his official duties, has in his possession or under his control an infernal machine or a similar instrument, contrivance or device shall be punished by imprisonment in the state prison for not more than ten years or in jail for not more than two and one half years, or by a fine of not more than one thousand dollars, or by both such fine and imprisonment, and the said machine, instrument, contrivance or device shall be forfeited to the commonwealth. The term 'infernal machine', as used in this section, shall include any device for endangering life or doing unusual damage to property, or both, by fire or, explosion, whether or not contrived to ignite or explode automatically and whether or not disguised so as to appear harmless. Notice of the seizure of any such machine, instrument, contrivance or device shall be sent forthwith to the commissioner of public safety and the article seized shall be subject to his order." G. L. c. 266, § 102A, as amended by St. 1970, c. 422.

[4]In 2001, the Legislature enacted G. L. c. 266, § 102A1/2, criminalizing possession or use of "hoax" devices causing anxiety, unrest, fear, or personal discomfort, including hoax infernal machines, but simply reiterated the language of § 102A without additional elaboration. See St. 2000, c. 421.

[5]The few cases are discussed *infra.*

[6]Carter invokes the recognized canon of statutory construction that words in a statute are to be given their "ordinary meaning" and "approved usage" as

"device" proscribed by reference to the injurious consequences of its use rather than by a description or explanation of its essential characteristics.[7] Its synonyms in § 102A — "instrument, contrivance or device" — are similarly undefined, and their dictionary definitions provide relatively little assistance, because each word is circularly described in terms or as a species of the others.[8]

We are thus dealing with a statute that must be deemed ambiguous, not merely because of the difficulties presented in penetrating the meaning of its unusual, seemingly anachronistic central term, "infernal machine," but also because that critical term can plausibly be understood — and has been by the parties — in at least two different senses. See AT&T v. Automatic Sprinkler Appeals Bd., 52 Mass. App. Ct. 11, 14 (2001). See also New England Med. Center Hosp., Inc. v. Commissioner of Rev., 381 Mass. 748, 750 (1980) (a statute is unambiguous if virtually all reasonable people would fairly attribute only one meaning to it and would consider alternative meanings strained, far-fetched, unusual, or unlikely). We are persuaded on the basis of several factors that Carter's position, that the infernal machine condemned by § 102A must be an assembled object, rather than separate detached parts, should prevail.

---

reflected in the dictionary — a principle of dubious relevance here, given the oddity and rarity of the term "infernal machine" and its virtual nonexistence in common speech, even as slang or idiom. The dictionary and encyclopedia references Carter mentions are no more illuminating than the words of § 102A themselves, because the references "define" infernal machine as a "machine," "apparatus," "device," or "bomb" "designed to explode" so as to cause injury or destruction, or "contrived by common criminals to accomplish murder and destruction of property."

[7]Compare the statutory specificity of the other crime of which Carter was convicted: unlawful distribution of the class D controlled substance (G. L. c. 94C, § 32C) marijuana (G. L. c. 94C, § 31), a substance objectively and lavishly defined as "all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; and resin extracted from any part of the plant; and every compound, manufacture, salt, derivative, mixture, or preparation of the plant, its seeds or resin." G. L. c. 94C, § 1, as appearing in St. 1998, c. 104, § 1.

[8]See, for example, The American Heritage Dictionary of the English Language 400, 497, 908, 1047 (4th ed. 2000) ("contrivance . . . [s]omething contrived, as a mechanical device"; "device . . . [a] contrivance or an invention . . . especially a machine"; "instrument . . . [a]n implement . . . . A device"; "machine . . . [a] device").

Although we are hindered in applying the usual tests for resolving ambiguity,[9] the language used in § 102A does afford insights that point to resolution of its appropriate meaning. First, the very singularity of each term used — "an infernal machine" or "a similar instrument, contrivance or device" — connotes something that constitutes an individual object, whether inherently unitary or rendered so by the integration of several objects. None of the terms logically gives rise to an image of discrete, disconnected components that are scattered or physically separated from each other.

Moreover, the principal dictionary definitions of the most significant term, "machine," lend support to the conception of an "infernal machine" as consisting of one, not several, things. See Webster's Third New Intl. Dictionary 1353 (3d ed. 1993) ("machine . . . (1): *an assemblage of parts . . .* that transmit forces, motion, and energy one to another in some predetermined manner and to some desired end") (emphasis added); The American Heritage Dictionary of the English Language 1047 (4th ed. 2000) ("machine . . . 1a. *A device consisting of fixed and moving parts* that modifies mechanical energy and transmits it in a more useful form") (emphasis added). See also The Columbia Encyclopedia 1706 (6th ed. 2000) ("machine . . . *arrangement of moving and stationary mechanical parts* used to

---

[9]We must interpret a statute that is not clear and unambiguous "according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Commonwealth* v. *Connor C.*, 432 Mass. 635, 640 (2000), quoting from *Champagne* v. *Champagne*, 429 Mass. 324, 326 (1999). Unfortunately, as to G. L. c. 266, § 102A, we have no information as to actual legislative intent or purpose, the key term "infernal machine" has no ordinary and approved usage, the statutory synonyms yield unhelpfully circular meanings, and we are unaware of the precise mischief or imperfection the enactment was intended to rectify or the main object sought to be achieved, beyond providing the authorities with an added weapon to proceed in the interest of public safety against a type of explosive or incendiary device presumably thought not to be adequately covered by existing statutes. As discussed *infra*, however, the words of the statute do provide a helpful starting point.

perform some useful work") (emphasis added).[10]

More significantly in favor of Carter's position is the well-established rule of lenity consisting of interrelated principles mandating that "criminal statutes are to be construed narrowly," *Commonwealth* v. *Kerr*, 409 Mass. 284, 286 (1991), and "strictly against the Commonwealth," *Commonwealth* v. *Wotan*, 422 Mass. 740, 742 (1996), quoting from *Commonwealth* v. *Gagnon*, 387 Mass. 567, 569, *S.C.*, 387 Mass. 768 (1982), cert. denied, 461 U.S. 921, and cert. denied, 464 U.S. 815 (1983); and that "[w]e must resolve in favor of criminal defendants any reasonable doubt as to [a] statute's meaning," *Commonwealth* v. *Connolly*, 394 Mass. 169, 174 (1985), to the end that "[i]f the statutory language 'can plausibly be found to be ambiguous,' . . . the defendant [must] be given 'the benefit of the ambiguity,' " *Commonwealth* v. *Carrion*, 431 Mass. 44, 45-46 (2000), quoting from *Commonwealth* v. *Roucoulet*, 413 Mass. 647, 652 (1992). In short, we must resolve any doubt that lingers as to the reach of an ambiguous criminal statute in favor of a defendant, that is, against finding a criminal violation. See *Commonwealth* v. *Gagnon*, *supra* at 569. See also *Rewis* v. *United States*, 401 U.S. 808, 812 (1971).

As applied to the facts of this case, the rule of lenity,

---

[10]For illustrative purposes only, we note that, had the Legislature sought to criminalize the possession of separate parts or components of an infernal machine, language similar to that found in the Federal statute, 18 U.S.C. § 921(*a*)(4) (2000 & Supp. 2003), would have clearly identified that intent. Section 921(*a*)(4) states that a "destructive device" means "(A) any explosive, incendiary, or poison gas (i) bomb, . . . or (vi) device similar to any of the devices described in the preceding clauses; . . . and (C) *any combination of parts* either designed or intended for use in converting any device into any destructive device described in subparagraph (A) or (B) and *from which a destructive device may be readily assembled*" (emphasis added). See, e.g., *United States* v. *Lussier*, 128 F.3d 1312, 1315 (9th Cir. 1997), cert. denied, 523 U.S. 1131 (1998) ("[o]n its face, subsection [C] [of 18 U.S.C. § 921(*a*)(4)] applies only to materials that have not yet been assembled into a whole: it speaks of '*parts*' designed or intended '*for use in converting*' something into a bomb or similar device. In contrast, subsection [A] applies only to an assembled device, i.e., parts that *have been converted* into a bomb or similar device"). Section 921 was enacted in 1968 (Pub. L. 90-351, Title IV, § 902, 82 Stat. 226) and thus existed when the Legislature added § 102A½ to G. L. c. 266, punishing "hoax devices" appearing to be infernal machines, without elaborating but merely reiterating the descriptions contained in § 102A.

combined with the singular number of the key terms in the statute, the most common concept of a "machine" as something whole made up of constituent parts, and the Legislature's failure to adopt the specificity of the cognate Federal statute, persuades us that what the Commonwealth proved Carter possessed cannot unambiguously be said to be an infernal machine of the sort penalized by § 102A. The statute cannot be construed to criminalize the possession of discrete, unconnected, and physically separated items that represent, at most, parts and materials that might potentially be assembled into an infernal machine or similar device capable of exploding or igniting but have not been so integrated and converted yet. The ordinary citizen would undoubtedly be astonished to learn that his possession of separate items of potentially explosive or inflammatory materials, particularly items that have legitimate social utility other than as destructive weaponry[11] — such as gasoline or kerosene,

---

[11]The Commonwealth's evidence presented through expert testimony brought out the fact that C-4 explosive and blasting caps were materials that had a number of legitimate applications, not only for construction and road projects involving blasting, but also (as to the C-4 explosive) for heating and cooking in emergencies. The expert testimony did not, however, establish that the two objects discovered in separate areas of the metal cabinet drawer posed any threat in situ of explosion or ignition without additional assembly and at least one additional component. The C-4 explosive, which the searching police had been most concerned about, was extremely stable, "user friendly," and incapable of exploding without having a detonator and fuse attached. Moving it, dropping it, throwing it, or even burning it would not cause it "to go off." Although the expert stated that the blasting caps were highly sensitive and had to be gingerly handled, he did not offer any testimony indicating that the caps, as found in a separate container in the drawer (a container which the expert recognized to be a specially designed case for holding blasting caps), would have been capable of detonating the C-4 explosive as it lay inside the nylon bag some distance away from the case of caps. He testified that the preferred method of setting off C-4 explosive was by inserting a blasting cap into the plastic explosive, adding a fuse, and then lighting it. Even though a blasting cap is highly sensitive to shock and could detonate if dropped from waist high, no evidence was presented that if a blasting cap were so dropped near a block of C-4 explosive it would detonate the C-4 explosive. The expert predicted detonation only if the cap were "embedded into the C-4." Notwithstanding the expert's expressed concerns about the volatility of blasting caps and the inadvisability of transporting them without extreme precautions, the searching police had picked up the box of caps from the metal cabinet outside the bedroom, opened it to see what its contents were, then car-

old rags, matches, and empty bottles stored in his garage or basement[12] — would expose him to a ten-year prison sentence.[13]

The lack of any reported cases, in the almost seventy-five year history of the statute, suggesting (much less holding) that several unconnected objects even in relative proximity can constitute an infernal machine is not without significance. See *Commonwealth* v. *Sexton*, 41 Mass. App. Ct. 676, 679-680 (1996), *S.C.*, 425 Mass. 146 (1997). Of greater force is the fact that the few cases mentioning § 102A buttress the construction that requires an infernal machine to be some form of integration or assembly of critical component parts into a single device.

In the only decision expressly addressing the issue, *Commonwealth* v. *Bushway*, 7 Mass. App. Ct. 715 (1979), the defendant had poured gasoline from a plastic jug into several lightweight plastic trash bags tied with a knot at the top. *Id.* at 716. Expert testimony established that such packaging encouraged vaporization of the gasoline and expansion of the bags to a volatile and dangerous condition, needing only the presence of a heat or ignition source to explode. *Id.* at 717. In upholding the

ried the caps, along with the C-4 explosive, to the entranceway to Carter's house, where they had placed the items on the floor, all without incident.

[12]Compare *Commonwealth* v. *DeCicco*, 44 Mass. App. Ct. 111, 114-115 (1998) (defendant's construction of a "Molotov cocktail" "fire bomb" out of methanol, rags, a white face cloth, and matches, which he stuffed into a bottle, set on fire, and threw through a window, led to his conviction of, inter alia, possession of an infernal machine).

Any farmer storing fertilizer and fuel oil in his barn would face similar peril. Compare *United States* v. *Lorence*, 706 F.2d 512, 515 (5th Cir. 1983); *United States* v. *Spruill*, 118 F.3d 221, 223 (4th Cir.), cert denied, 522 U.S. 1006 (1997).

[13]Although Carter does not argue the point, the enigmatic and undefined term "infernal machine" calls to mind the basic constitutional principle that, as a matter of due process, a criminal statute that fails to define the criminal offense with sufficient clarity to allow a person of ordinary intelligence to understand what conduct is forbidden may be deemed void for vagueness. See *Commonwealth* v. *Williams*, 395 Mass. 302, 303-304 (1985). "[N]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." *United States* v. *Batchelder*, 442 U.S. 114, 123 (1979), quoting from *Lanzetta* v. *New Jersey*, 306 U.S. 451, 453 (1939). Where there is any doubt about the proper construction of a statute, we are bound to prefer that interpretation that "averts constitutional difficulties." *Commonwealth* v. *Crosscup*, 369 Mass. 228, 234 (1975).

defendant's conviction for possession of an infernal machine, this court stated:

> "[W]e have no trouble concluding that the evidence in this case was sufficient for the jury to find that a lightweight plastic bag tied with a knot and partially filled with gasoline was a 'device' under G. L. c. 266, § 102A, *since it was a piece of equipment put together to serve a particular purpose. . . .* The defendant maintains that in order to constitute 'devices,' the bags *must be shown to have been assembled* according to an inventive scheme for the purpose of performing a physical task. The judge [correctly] recognized the validity of that contention and instructed the jury to that effect when he told them, '*[I]t must be something which is made. It cannot be simply one element. It must consist of more than one part* in order to be a device, instrument or machine or contrivance [under § 102A].' We are not compelled . . . to adopt a definition of the word 'device' which confines its application to intricate contrivances."

*Commonwealth* v. *Bushway*, 7 Mass. App. Ct. at 717-718.

The facts in the other cases involving convictions under § 102A lend support to the conclusions of *Commonwealth* v. *Bushway*, *supra*, that an infernal machine must be "a piece of equipment put together," a device "shown to have been assembled," "something which is made . . . consist[ing] of more than one part." In *Commonwealth* v. *Kennedy*, 360 Mass. 859 (1971) (in which the defense was that the defendant did not possess the guilty object), the device (as described in *Commonwealth* v. *Bushway*, *supra* at 717) was "an explosive pyrotechnical bomb shell . . . [that] contained explosive powder."

The device in *Commonwealth* v. *Lombardo*, 23 Mass. App. Ct. 1006 (1987) (in which the defendant asserted that his guilty plea was invalid because the judge never explained the allegedly essential element of intent[14]), was a similar combination: a "cigarette package, filled with explosive gunpowder." *Id*. at

---

[14]In *Commonwealth* v. *Lombardo*, *supra* at 1007-1008, we noted that although "[t]here is no express requirement in [§ 102A] of an intent to use the device for an illicit purpose . . . [and] the Commonwealth did not have the burden of proving that purpose as a separate element of the offense,"

1007. Also composed of several parts was the infernal machine that the defendant in *Commonwealth* v. *Chase*, 26 Mass. App. Ct. 578 (1988), was convicted of possessing (a conviction he did not directly challenge): "the device . . . consisted of two propane canisters, connected to two telephone books by means of masking tape and a coat hanger wire, and a flammable agent, epoxy thinner." *Id.* at 579. In *Commonwealth* v. *DeCicco*, 44 Mass. App. Ct. 111 (1998) (in which the defendant claimed numerous errors but none relating to § 102A), the infernal machine was a "Molotov cocktail" "fire bomb" that "was made" by the defendant by filling a bottle with methanol, then stuffing a rag and matches into the bottle. *Id.* at 114, 115. Cf. *Commonwealth* v. *Cotto*, 52 Mass. App. Ct. 225, 226 (2001) (defendant, charged with numerous crimes not including a violation of § 102A, illegally broke into a home by throwing through a window an "infernal machine," consisting of "a white plastic bottle . . . [that] contained gasoline").[15]

*Conclusion.* Under settled principles of statutory construction

---

*Commonwealth* v. *Bushway, supra* at 718, suggested that intent by the person in possession to use the device for an unlawful purpose was a required element in situations where the device involved was "*of such a nature and construction* that [it] may reasonably be put to benign use" (emphasis added). Carter's undeveloped argument that his motion for a required finding of not guilty should have been allowed because there was no proof of intent on his part to use the concealed explosive against Neilson, or anyone else, is based on the premise that at least the C-4 explosive was an item having "benign" uses (see note 11, *supra*); but even if intent is a necessary element to be proved by the Commonwealth, the defendant's contention founders on the evidentiary fact that he not only possessed what the Commonwealth claims was an infernal machine but also threatened at least twice to use "it" to blow up Neilson. The issue is nonetheless moot under the rationale of our decision.

[15]We find unpersuasive the Commonwealth's reliance on the words in the next-to-last sentence of § 102A: "[t]he term 'infernal machine' . . . shall include any device for endangering life or doing unusual damage to property, or both, by fire or, explosion, whether or not contrived to ignite or explode automatically." G. L. c. 266, § 102A, as amended by St. 1970, c. 422. Not only is that reliance entirely conclusory and lacking any reasoned discussion or analysis supported by authority, contrary to Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975), but it also merely begs the ultimate constructional question because the quoted language in no way logically demonstrates or even intimates that the prohibited device can consist of several disassembled or separate parts rather than "a piece of equipment put together[,] . . . assembled[,] . . . [or] made." *Commonwealth* v. *Bushway, supra* at 717-718.

and the guidance of prior case law, the Commonwealth's evidence that Carter stored a brick of C-4 explosive in a drawer, and blasting caps nearby in a separate box, did not establish that he possessed an infernal machine in violation of G. L. c. 266, § 102A.[16] Carter's motion for a required finding of not guilty as to the charge of violating § 102A should, therefore, have been allowed.[17]

The judgment of conviction on the possession of an infernal machine charge is reversed, the verdict is set aside, and judgment is to be entered for the defendant.

*So ordered.*

---

[16]The Commonwealth is not left without a remedy to protect the public safety in such cases because (as Carter concedes) it could have charged Carter with possession of a "bomb or other high explosive," in violation of G. L. c. 148, § 35.

[17]Our analysis and conclusion make it unnecessary to reach Carter's challenges to the Commonwealth's having been allowed to play a videotaped explosion caused by a combination of C-4 explosive, blasting caps, and an electronically activated fuse, and to the judge's answer to a juror's question, which Carter speculates suggested to the jury that he possessed other dangerous items in his home.