Meredith & Grew, Incorporated *v.* Worcester Lincoln, LLC.

Meredith & Grew, Incorporated *vs.* Worcester Lincoln, LLC, & another.[1]

No. 04-P-83.

Suffolk. November 5, 2004. - July 28, 2005.

Present: Lenk, Duffly, & Kantrowitz, JJ.

*Broker,* Mortgage. *Frauds, Statute of. Contract,* With broker, Implied. *Consumer Protection Act,* Unfair or deceptive act. *Statute,* Construction.

In a civil action arising out of a real estate broker's provision of commercial mortgage brokering services on the plaintiff's behalf to the defendants as clients, the judge erred in granting summary judgment in favor of the defendants on the plaintiff's breach of contract claim, where the oral agreement for compensation between the plaintiff and the broker was not void under the Statute of Frauds, G. L. c. 259, § 7, in that the broker was acting in a professional capacity and therefore was exempt from the requirement that an agreement for compensation in connection with such services be in writing, and where material facts remained in dispute [147-152]; similarly, the judge erred in entering summary judgment in favor of the defendants on the plaintiff's claims based on quantum meruit [152] and G. L. c. 93A [153], where questions of fact remained outstanding, but the judge correctly entered summary judgment in favor of the defendants on the plaintiff's claim for an account stated, where the plaintiff not only failed to allege that the defendants ever assented to the correctness of the debt, but also affirmatively stated that the defendants had consistently refused to acknowledge the debt [152-153].

Civil action commenced in the Superior Court Department on February 1, 2002.

The case was heard by *Regina L. Quinlan,* J., on motions for summary judgment.

*Darragh K. Kasakoff* for the defendants.

*Paul Killeen* for the plaintiff.

Duffly, J. We decide in this appeal whether a licensed real estate broker providing commercial mortgage brokering services

[1]Plaza Properties, LLC.

to a client is a "licensed real estate broker . . . acting in [its] professional capacity" under the Statute of Frauds, G. L. c. 259, § 7, inserted by St. 1984, c. 321, and is therefore exempt from the requirement that an agreement for compensation in connection with such services be in writing. We conclude that the plaintiff real estate broker was acting in such a professional capacity and that the oral contract is not void.

*Background.* This action arises out of an oral brokerage contract between Meredith & Grew, Inc. (M&G), a national real estate service provider, and Sam Adams,[2] acting as an agent of Lincoln Plaza Group, LLC (Lincoln Group),[3] and, according to the plaintiff, as an agent of the defendants Plaza Properties, LLC (Plaza Properties), and Worcester Lincoln, LLC (Worcester).[4] M&G sought payment by the defendants of a one percent commission in connection with financing in the amount of $38.5 million that M&G says it successfully solicited on behalf of the defendants as clients of M&G. When the defendants failed to pay the commission, M&G brought this action in Superior Court. The complaint (as amended) sets forth a claim of breach of contract (count one); an alternative theory of recovery, quantum meruit, in a separate count (two); a claim for an "account stated" (count three); and a count (four) alleging violation of c. 93A.

On cross motions, summary judgment was entered in favor of the defendants on all counts of M&G's amended complaint. With respect to the breach of contract claim, the motion judge determined that M&G's real estate broker was not acting in his "professional capacity" within the meaning of G. L. c. 259, § 7, and that, therefore, any agreement for compensation in connection with mortgage brokerage services was void because it was not in writing. M&G filed this appeal.

We agree with M&G that the motion judge's interpretation of the phrase "licensed real estate broker . . . acting in their professional capacity," was erroneous. In basing her decision on

---

[2]Sam Adams, a California resident, is also known as Samuel Gould.

[3]Lincoln Group was a party to an earlier suit filed by the plaintiff. See discussion, *infra.*

[4]The defendants contest M&G's assertion that Adams represented Plaza Properties or Worcester in the brokerage agreement.

144        64 Mass. App. Ct. 142 (2005)

Meredith & Grew, Incorporated v. Worcester Lincoln, LLC.

this ground, the motion judge did not consider whether there were other disputed facts material to deciding the breach of contract claim. Because we decide that the contract is not void, and that the record reflects disputed facts material to resolution of the contract claim, the judgment must be vacated as to that claim and the matter remanded for further proceedings. We also vacate the judgment dismissing counts two and four; we affirm the judgment as to the remaining claim.

*Summary of facts.* As we have intimated, Adams's role in the creation of the oral brokerage agreement may, on remand, figure significantly in the eventual resolution of this dispute. Adams apparently wore many hats, and it is far from clear on this record which hat or hats he was wearing when he communicated with M&G's real estate brokers about the need for financing.

Lincoln Group and the defendants, Plaza Properties and Worcester, are all corporate entities related to one another through the Gould family trust and the Gould marital trust (the Gould trusts). Harriet Gould (Adams's mother) and Robert Bogan are trustees of the Gould trusts.[5] The trustees control, on behalf of the Gould trusts, at least twelve other companies in addition to these three.

The role of these companies is, in part, to hold title to commercial properties for the Gould trusts, with Plaza Properties supplying management services to the others. The commercial property that lies at the center of this dispute is a multi-tenanted shopping mall in the city of Worcester known as Lincoln Plaza. It is this forty-five acre property, for which financing was sought and eventually obtained, that is the subject of the brokerage agreement at issue.

The defendants Plaza Properties and Worcester are managed by Adams.[6] Plaza Properties and Adams are responsible for the management of Lincoln Plaza on behalf of the Gould trusts. At one point, Adams was also the manager of Lincoln Group, a corporation formed to hold a master lease that governed Lincoln

---

[5]As set forth in the motion judge's memorandum of decision, Adams "is a potential beneficiary and/or remainderman of the Trusts."

[6]Plaza Properties is a Massachusetts limited liability company and Worcester is a Delaware limited liability company; each has a principal place of business in Massachusetts.

Plaza at least until record title was transferred to Worcester in or about September, 1999.

Over the course of several years prior to 1999, M&G had on numerous occasions been engaged by the family members for the purpose of locating lenders willing to extend credit in connection with one or more of its entities. In July, 1999, Adams engaged M&G to find a lender who would be willing to loan funds in amounts sufficient to refinance existing debt secured by a mortgage on the Lincoln Plaza property, as well as to finance construction in connection with a major expansion of that mall. At the time, title to the Lincoln Plaza property was held by RFP-BCIA-WL Realty Trust (RFP-BCIA). Title had been transferred (along with that of several other Gould trust properties) to RFP-BCIA as part of a complex financing arrangement pursuant to which Lincoln Plaza was leased back to the Gould trusts, through Lincoln Group, with an option to repurchase upon repayment of the financing loan. The new loan that Adams had asked M&G to broker would have provided funds for the repurchase of Lincoln Plaza as well as for the mall expansion. Adams and the defendants knew from their prior dealings with M&G that it typically charged a contingent commission of one percent of the amount loaned.

M&G claims that Adams was acting as the common manager and agent of Lincoln Group and the defendants, Plaza Properties and Worcester, when he entered into an agreement for M&G's services to find a lender that would loan funds for the Lincoln Plaza project. Thus, even if the original borrower was, as represented by Adams, to have been Lincoln Group, the internal decision made by Adams — to change which entity would be borrower and hold title to the property — would have had no impact on the agreement with M&G. The defendants take the position that M&G's agreement was with Adams acting solely as agent for Lincoln Group,[7] and that Lincoln Group,

[7] The defendants claim as undisputed that the agreement was solely with Lincoln Group. They accomplish this by referencing M&G's verified complaint and an affidavit filed in the earlier action against Lincoln Group (see discussion, *infra*), in which (according to the defendants) M&G states that it entered into the express oral contract with Lincoln Group, and not with either of the defendants. The defendants also claim, for the first time on ap-

Lincoln Properties, and Worcester are "separate and distinct legal and business entities and not part of a single enterprise."

It is undisputed that M&G invested its efforts and used its contacts in the real estate industry to find a lender.[8] Sometime around August, 1999, M&G succeeded in obtaining an offer of a loan commitment from Dime CRE, Inc. (Dime), that was responsive to the defendants' needs. This offer, which identified Lincoln Group as the borrower, was conditioned on the fulfillment of certain financial requirements, including that leases would be entered into with certain identified "anchor" stores. It appears that the financial conditions could not be completed before the closing date specified in the loan commitment offer.

A month later, the defendants obtained what Dime referred to as a "bridge loan" to cover the refinancing and reacquisition portion of the project. At that time, Adams was involved in the decision that Worcester would be both the borrower on the loan as well as the entity that would reacquire title to Lincoln Plaza. As set forth in the memorandum of decision, this bridge loan was obtained "[o]wing directly to M&G's initial efforts to introduce [Lincoln Group] to Dime."[9] In return for its efforts, the defendants paid M&G a "discounted" commission in the amount of $101,250, or three-quarters of one percent of the amount of the bridge loan.

In the following year, on September 29, 2000, Worcester obtained a second loan from Dime in the amount of $38.5 mil-

peal, that the doctrine of judicial estoppel bars M&G from "now declar[ing] in this later action that it made that contract with [the defendants] instead."

The short answer to these claims is that nothing in these documents requires the inference urged by the defendants that Lincoln Group was the only entity with which M&G had an agreement, to the exclusion of other entities for whom Adams acted as agent.

[8] In her memorandum of decision, the motion judge stated, "M&G invested its efforts and used its contacts in the real estate industry to find a lender for *the defendants*" (emphasis added). It is clear from the arguments to the motion judge, if less so from the parties' briefs, that it is a disputed question of fact whether M&G was finding a lender for the defendants (that is, for Lincoln Properties and Worcester).

[9] M&G claims that there was an additional understanding between Dime and the defendants, to the effect that the defendants would eventually apply to Dime for financing of the original expansion project once they met Dime's conditions. Adams and the defendants assert that they have no knowledge of what Dime understood in this regard, and deny such an understanding existed.

lion. M&G claims that the proceeds from this second loan were to finance the expansion of the mall as both contemplated and described in M&G's original solicitation of the first loan, and that this second loan was, in essence, the second installment in the financing package that M&G had obtained through its efforts. The defendants dispute these contentions and assert that the September, 2000, proposal was different from that made a year earlier and that the defendants, without M&G's assistance, solicited other lending institutions in addition to Dime regarding what they claim is a new project. The defendants have paid no commission to M&G in connection with this second loan.

Prior to initiating this action against the defendants, M&G initiated an action on February 26, 2001, against Lincoln Group, seeking payment of the commission. A default judgment entered against Lincoln Group. When postjudgment discovery revealed that Lincoln Group was no longer functioning and had no assets, M&G initiated the present action.

*Discussion.*

1. *The contract claim.* In Superior Court, the defendants argued that G. L. c. 259, § 7, applied to its oral agreement with M&G because M&G, although a licensed real estate broker,[10] was not "acting in [its] professional capacity" when it found a lender willing to provide financing for the Lincoln Plaza expansion project. The motion judge agreed. The ruling in favor of the defendants on the contract claim was based primarily on the motion judge's construction of G. L. c. 259, § 7, that real estate brokers who are engaged solely in mortgage brokering services are not acting in the professional capacity of a real estate broker. We examine the motion judge's ruling de novo on issues pertaining to statutory construction. See *Lane* v. *MPG Newspapers*, 438 Mass. 476, 479 (2003); *Gross* v. *Prudential Ins. Co. of America, Inc.*, 48 Mass. App. Ct. 115, 118-119 (1999).

The defendants argue that the motion judge was correct to conclude that the definition of "real estate broker" set forth in another chapter of the General Laws — G. L. c. 112, § 87PP —

---

[10]It is undisputed that M&G is a Massachusetts licensed real estate broker, as is its senior vice president, David Douvadjian, with whom Adams primarily dealt in connection with the agreement at issue.

should be considered in the interpretation of the phrase "a licensed real estate broker . . . acting in [its] professional capacity" contained in c. 259, § 7.[11] They observe that the definition of real estate broker in c. 112, § 87PP,[12] does not include "mortgage brokering" as among the acts undertaken by a real estate broker and that, therefore, a real estate broker who is engaged solely to perform services as a mortgage broker is not acting in its professional capacity as a real estate broker.

Before it was amended by St. 1991, c. 144, § 1, the definition of real estate broker set forth in c. 112, § 87PP, included mortgage brokering.[13] The defendants view the 1991 amendment deleting references to mortgage brokering as providing support for their claim that for the purposes of G. L. c. 259,

---

[11]General Laws c. 259, § 7, inserted by St. 1984, c. 321, provides, in pertinent part:

> "Any agreement to pay compensation for service as a broker or finder or for service rendered in negotiating a loan . . . shall be void and unenforceable unless such agreement is in writing . . . . For the purpose of this section, the term 'negotiating' shall include identifying prospective parties, providing information concerning prospective parties, [or] procuring an introduction to a party to the transaction . . . . The provisions of this section shall apply to a contract implied in fact or in law to pay reasonable compensation but shall not apply to a contract to pay compensation for professional services of an attorney-at-law or a licensed real estate broker or real estate salesman acting in their professional capacity."

[12]General Laws c. 112, § 87PP, as amended by St. 1991, c. 144, § 1, defines "real estate broker" as "any person who for another person and for a fee, commission or other valuable consideration, or with the intention or in the expectation or upon the promise of receiving or collecting a fee, commission or other valuable consideration, does any of the following: — sells, exchanges, purchases, rents or leases, or negotiates, or offers, attempts or agrees to negotiate the sale, exchange, purchase, rental or leasing of any real estate, or lists or offers, attempts or agrees to list any real estate, or buys or offers to buy, sells or offers to sell or otherwise deals in options on real estate, or advertises or holds himself out as engaged in the business of selling, exchanging, purchasing, renting or leasing real estate, or assists or directs in the procuring of prospects or the negotiation or completion of any agreement or transaction which results or is intended to result in the sale, exchange, purchase, leasing or renting of any real estate."

[13]Statutes 1991, c. 144, § 1, an emergency act, deleted, from the end of the definition of real estate broker, "or negotiates or offers or attempts or agrees to negotiate a loan secured or to be secured by mortgage or other encumbrance upon real estate."

§ 7, mortgage brokering is not an activity that a real estate broker performs in its professional capacity. Our review of § 87PP and the legislative history surrounding the amendment and related enactments leads us to a different conclusion.[14]

We first note that § 87PP itself states that its definitions are "[f]or the purposes of sections eighty-seven PP to eighty-seven DDD" of c. 112. G. L. c. 112, § 87PP, inserted by St. 1957 c. 726, § 2. All of those sections fall under the heading "Registration of Real Estate Brokers and Salesmen." St. 1957, c. 726, § 2. Thus, the purpose of § 87PP is to define that set of activities that requires licensing as a real estate broker; it does not limit the actions that may be engaged in by a real estate broker. Indeed, it may be inferred from certain provisions in the real estate broker registration statute itself that mortgage brokering remains an activity engaged in by both real estate brokers and real estate salesmen.[15]

Under the very same legislation by which it amended § 87PP, the Legislature created G. L. c. 255E, a new licensing scheme for residential (but not for commercial) mortgage brokers. See St. 1991, c. 144, § 3.[16] These contemporaneous legislative changes may be harmonized by construing the amendment of

---

[14]We disagree with the defendants that we may not consider M&G's arguments as to the legislative history of § 87PP. See *Fidelity Mgmt. & Research Co.* v. *Ostrander*, 40 Mass. App. Ct. 195, 200 (1996). Because the defendants raised the statute as a defense, the motion judge was required to interpret the meaning of the ambiguous phrase. The statutory interpretation issue having been addressed by the motion judge, we may consider arguments on the propriety of her ruling.

[15]References to mortgage brokering as an activity performed by real estate brokers and real estate salesmen were not deleted from any other provisions in the real estate brokers licensing statute. See, e.g., G. L. c. 112, § 87QQ (person without real estate broker license may broker loans for self or for employer acting for self); G. L. c. 112, § 87RR (negotiating of mortgage by salesman must be supervised by licensed real estate broker); G. L. c. 112, § 87AAA (prohibiting brokers from mentioning the board of registration of real estate brokers and salesmen while promoting the mortgage of property).

[16]The preamble to St. 1991, c. 144, states that the purpose of the act was to "immediately provide for the licensing of certain mortgage lenders and brokers." St. 1991, c. 144. It would seem that the law was changed in response to a series of residential mortgage schemes that had been uncovered and prosecuted. See, e.g., *Matter of Concemi*, 422 Mass. 326 (1996); *Matter of Nickerson*, 422 Mass. 333 (1996); *United States* v. *Concemi*, 957 F.2d 942 (1st Cir. 1992); *United States* v. *Walsh*, 75 F.3d 1 (1st Cir. 1996)

§ 87PP, which removed language describing mortgage broker-ing from the definition of "real estate broker," as an indication of the Legislature's intent to avoid a dual licensing requirement for residential mortgage brokers. Stated otherwise, the Legislature created a new licensing scheme for residential mortgage brokers but did not require them also to obtain a real estate broker's license.

Prior to 1991, neither residential nor commercial mortgage brokering was regulated outside of the requirement that anyone who "negotiates or offers or attempts or agrees to negotiate a loan secured or to be secured by mortgage or other encumbrance upon real estate" must register as a real estate broker. G. L. c. 112, § 87PP, as appearing in St. 1957, c. 726, § 2. The enactment of the 1991 legislation, creating licensing requirements for residential (but not commercial) mortgage brokering, imposed no new restrictions on commercial mortgage brokering activity.[17]

Thus, neither the change in the definition of real estate broker in c. 112, nor the addition of the mortgage brokers licensing statute through enactment of c. 255E, can be seen as imposing any restriction on a real estate broker's ability to place or find commercial mortgage loans. The question, then, is whether the ordinary and approved usage of the term "real estate broker" also includes mortgage brokering, such that the finding of a commercial mortgage lender can be construed as falling within the definition of "acting in [a real estate broker's] professional capacity" for purposes of c. 259, § 7.

As we have previously observed, c. 112 contains references to mortgage brokering as an activity undertaken by real estate brokers and salespersons. See note 15, *supra*. However, because the real estate broker licensing statute and the Statute of Frauds are not in pari materia, we have some doubt about the useful-ness of relying solely on c. 112 to ascertain the meaning of c. 259. See *Commonwealth* v. *Smith*, 431 Mass. 417, 420 (2000); *Cambridge* v. *Cambridge Police Patrol Officers Assn.*, 58 Mass.

---

[17]A "mortgage broker" subject to the licensing requirement of c. 255E is specifically described as "any person who for compensation or gain, or in the expectation of compensation or gain, directly or indirectly negotiates, places, assists in placement, finds or offers to negotiate, place, assist in placement or find mortgage loans on *residential property* for others" (emphasis added). G. L. c. 255E, § 1.

App. Ct. 522, 525-526 (2003). Therefore we look to "ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished." *Commonwealth* v. *Smith, supra* at 421, quoting from *Registrar of Motor Vehicles* v. *Board of Appeal on Motor Vehicle Liab. Policies & Bonds*, 382 Mass. 580, 585 (1981). We may look to dictionary definitions to ascertain the ordinary and approved usage of the term. See *Commonwealth* v. *Smith, supra* at 422 (consulting dictionary for ordinary usage of term); *Commonwealth* v. *Carter*, 61 Mass. App. Ct. 205, 209-210, *S.C.*, 442 Mass. 822 (2004) (same). The definition of "real estate broker" in Black's Law Dictionary includes persons "who negotiate loans on real-estate security." Black's Law Dictionary 175 (5th ed. 1979). Other sources evince a similar understanding. For example, the Dictionary of Occupational Titles[18] states that the duties of a real estate broker usually includes "arranging loans." II Dictionary of Occupational Titles with O*NET Definitions 1865 (5th ed. 2003). Additionally, several dictionaries of real estate terminology also include mortgage brokering in their definitions of real estate broker. See, e.g., Cox, Cox, & Silver-Westrick, Prentice Hall Dictionary of Real Estate 204 (pocket ed. 2001); Shim, Siegel, & Hartman, Dictionary of Real Estate 231 (1996). Cf. Arnold, Arnold Encyclopedia of Real Estate 62 (2d ed. 1993) (defining "broker" generally, and including "mortgage" and "real estate" as examples of specialties); Allen & Wolfe, The Allen & Wolfe Illustrated Dictionary of Real Estate 1.14, 1.73, 1.90 (1983) (same); Friedman, Harris, & Lindeman, Barron's Dictionary of Real Estate Terms 59 (6th ed. 2004) (defining broker generally as licensed agent acting in real estate transactions); Harrison & Harrison, Illustrated Dictionary of Real Estate & Appraisal 244 (1983) (real estate broker is one who "make[s] sales, rentals, and other real-estate related contracts").

Based on the foregoing authorities, we conclude that the

---

[18]This dictionary is prepared by the National O*NET Consortium in conjunction with the United States Department of Labor. (O*NET is a trademarked term that stands for Occupational Information Network.) The dictionary sets forth a uniform classification system of job titles and descriptions with which the Department of Labor organizes its occupational statistics.

ordinary and approved usage of "real estate broker" includes one who engages in the brokering of mortgages. This conclusion is consistent with a likely purpose of the real estate broker exception. See *Bay Colony Mktg. Co.* v. *Fruit Salad, Inc.*, 41 Mass. App. Ct. 662, 667 (1996) (stating that purpose of exception may be that "such professionals frequently provide services respecting loans or the transfer of a business which fall within the definition of negotiating"). It is also consistent with our interpretation of the legislative history of chapters 112 and 255E. In sum, we think that the phrase "real estate broker . . . in [its] professional capacity" includes commercial mortgage brokering services of the type asserted here. Consequently, the oral brokerage contract at issue in this case is not one that is required by G. L. c. 259, § 7, to be in writing.

Because material facts remain in dispute (including the facts relative to the relationships between the various entities controlled by the Gould trusts; whom Adams was representing in his negotiations with M&G; the degree of similarity between the expansion loan for which M&G solicited lenders and the loan that the defendants allege they obtained independently of M&G's efforts), the judgment must be vacated as to the plaintiff's contract claim and the matter must be remanded for further action in the Superior Court.

2. *Claim based on quantum meruit.* Although the contract between M&G and Adams is not void, other fact issues may now arise that could affect a determination whether M&G's agreement binds the defendants. If an explicit agreement between M&G and the defendants is found not to exist, the evidence may support M&G's claim that there is an implied contract between it and the defendants. We will, therefore, vacate the judgment of dismissal as to this claim, and remand for further action in Superior Court.

3. *Claim for an account stated.* The motion judge correctly entered summary judgment against M&G on its "Action Upon an Account Stated," since M&G not only failed to allege that the defendants ever assented to the correctness of the debt, but also affirmatively stated that the defendants had consistently refused to acknowledge the debt. See *Milliken* v. *Warwick*, 306 Mass. 192, 196-197 (1940) (a claim for an account stated

requires either an express or an implied assent to the debt by the debtor).

4. *Chapter 93A claim.* The motion judge concluded that summary judgment was proper on M&G's c. 93A claim for the reason that M&G failed to demonstrate sufficient facts to support recovery. Focusing on the plaintiff's allegations of "the defendants' refusal to pay the alleged debt, the default on the suit against [Lincoln Group], and [Lincoln Group's] transfer of its right to acquire Lincoln Plaza to Worcester," the judge determined that what was at issue was nothing more than an ordinary dispute over whether money was owed.

In addition to the foregoing allegations, however, the summary judgment record reveals allegations from which it might reasonably be inferred that the defendants had engaged in unfair or deceptive conduct.[19] We are unable on this record to conclude that a trier of fact could only find the conduct complained of to amount to a simple breach of contract. See, e.g., *Massachusetts Employers Ins. Exch.* v. *Propac-Mass, Inc.*, 420 Mass. 39, 43 (1995) ("breach of the implied covenant of good faith and fair dealing may constitute an unfair or deceptive act or practice for the purposes of G. L. c. 93A"). The judgment must be vacated as to the c. 93A count, with further proceedings to be held thereon.

*Conclusion.* So much of the judgment as dismisses count three of the plaintiff's amended complaint is affirmed. The balance of the judgment is vacated, and the matter is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

---

[19]For example, the record would support the reasonable inference that the defendants deceived M&G about the role in the transaction of Lincoln Group — which never had sufficient assets to pay M&G's commission — in order to lull M&G into pursuing Lincoln Group for its commission, while the defendants engaged in conduct to make it seem that they had used their own efforts to obtain the loan from Dime, all the while knowing that the lender had been found by M&G.