Moses, Richard T., J.
INTRODUCTION
The present action was filed by George Brenner (“Brenner”) who is a licensed real estate broker and president of the plaintiff, Brenner Realtors, Inc. (“Brenner Realtors”). Named as defendants are Frank Marchione (“Marchione”) and Nicola Marchione as trustees of Catahoula Realty Trust (the “Trust”). The plaintiffs’ claims arise out of a listing agreement entitled “Authorization to Sell” and dated May 15, 2008. The amended complaint sets forth four claims for relief.
Count I asserts a claim for breach of contract alleging that a commission is owed in connection with a buyer who purportedly agreed to purchase the premises which were the subject of the listing agreement for $3,000,000.00.
Count II asserts a claim for breach of contract alleging that a commission is owed in connection with the sale of the premises to a buyer procured by plaintiff at a selling price of $5,275,000.00.
Count III asserts a breach of the terms of the listing agreement by way of removal of the property from the market prior to the alleged expiration date of the listing agreement.
Count IV asserts a claim of the breach of the covenant of good faith and fair dealing.
BACKGROUND
The summary judgment record reveals the following facts.
Brenner, acting on behalf of Brenner Realtors, had, on at least several occasions, acted as a real estate broker for Frank and Nicola Marchione and/or one or more entities controlled for them. At all relevant times of this proceeding, the Trust was and is the owner of the real estate situated at 240 Hartwell Street and 350 Rodman Street, Fall River, Massachusetts, which are contiguous parcels bounded by Hartwell Street, Rod-man Street, Plymouth Avenue and Route 195. On or about June 18, 2007, Brenner, on behalf of Brenner Realtors and Frank Marchione on behalf of the Trust, executed an open listing agreement listing a portion of the Trust’s premises with Brenner Realtors as a nonexclusive broker. The term of the agreement was ninety days. Brenner Realtors was unsuccessful in marketing the premises. The listing agreement entitled “Authorization to Sell,” was executed by the parties on or about May 15, 2008 and also related to a portion of the premises owned by the Trust. Such listing agreement describes as the premises which are subject to sale, “gas station, C-store, Dunkin Donuts franchise operation, and Chinese restaurant; to be built at 240 Hartwell Street, Fall River, MA.” The listing agreement further references that Brenner would list the premises with Multiple Listing Service (“MLS”) and Rhode Island statewide MLS. The duration of the agreement was for 180 days with the provision that it would remain in effect for an additional 180 days “... during which additional period the seller may terminate this agreement by 30 days notice, in writing, certified or registered mail to the realtor.” The listing agreement further provides in part:
In the event that a buyer is procured in accordance with the terms of this agreement, ready, willing and able to purchase the property, or if said property is sold or exchanged by the seller or any other person during the term of this agreement or within six months after this agreement terminates, the property is sold or exchanged by the seller, or any other person to a buyer who has been referred to or shown the property by the Realtor, or through the Realtor’s office in cooperation with another real estate broker or any other person in accordance with the terms of this agreement, the seller agrees to pay the Realtor a fee for professional services of 6% of the selling price.
The listing agreement also contains a provision that:
*216 A 3% processing fee of the aforementioned listed selling price shall be paid by the seller to the Realtor should the seller remove the property from the market prior to the expiration of this agreement.
It is apparent from the record that at the time of the execution of the listing agreement, the Trust was in the process of taking the necessary steps to construct the structures necessary for the operation of the several entities described in the listing agreement.
In response to questioning from the defendants’ counsel, Brenner testified that he may very well have had a conversation with Frank Marchione that if there were no buyers for the premises by the time the facility was built, Marchione would operate the facility himself. There is little or no evidence as to what, if any, additional information was provided to Brenner on or around the time that the listing agreement was signed. It appears that as the project evolved, certain circumstances changed. Brenner purportedly was under the impression that a Dunkin Donuts franchise already existed at the site and that Dunkin Donuts had approved a drive-thru. The record establishes that Marchione felt reasonably sure that he could obtain both. Furthermore, Marchione had purportedly received a verbal commitment as to a Chinese restaurant operating at the site although no lease was signed at the inception of the listing agreement. The summary judgment record fails to contain evidence of a request by Brenner for copies of any lease or franchise agreement in connection with the premises. Furthermore, Brenner asserts some misrepresentation by Marchione relating to the absence of a commitment to an oil company with respect to the providing of fuel to the gas station. Marchione committed to a company at some time into the project after the execution of the listing agreement, however the record fails to establish when such commitment was made.
The summaiy judgment record demonstrates that the development of the subject premises by the Trust constituted an extremely complex project which would require detailed terms for any purchase and sale agreement between the Trust and a buyer procured by Brenner. On its face, the listing agreement is woefully inadequate in describing precisely what Brenner was marketing for the sum of $3,000,000.00. For instance, there are no provisions as to the terms of any lease or leases for the Chinese restaurant or for any other part of the site, nor is there any explanation as to precisely what was “. . . to be built at 240 Hartwell Street . . There are no building specifications in connection with the project, nor any indication as to whether anything that was to be built would be equipped with fixtures and, if so, what such fixtures it would be. There is also no timeline as to the completion of the buildings.
The record reveals that an individual named Ankit Patel (“Patel”) executed a one-page “Offer to Purchase Real Estate” form on or about August 21, 2008, offering to purchase the premises for $2,500,000.00. This offer was rejected by the Trust. On November 10, 2008, a second offer to purchase for the sum of $3,000,000.00. This one-page offer to purchase was contingent upon “owner or conventional bank financing at 6.5% or prevailing commercial rate, whichever is less, in the amount of $2,400,000.00.”
When asked at deposition about this provision, Brenner testified, “(i]t means that the buyer can get his financing either commercially, through a bank, a conventional bank, or through the owner or any other type of financing that is satisfactory to the buyer at 6.5% for $2,400,000.00.” When asked whether or not if the buyer could not obtain financing upon those terms he would have an obligation to proceed with the purchase, Brenner responded that would depend on the contents of the subsequent purchase and sale agreement. The aforementioned offer to purchase was subject to “the execution of a mutually satisfactory purchase and sale agreement for the properly which shall then become the agreement between the parties, no later than November 17, 2008.” Additional provisions of the offer included:
Sale to include completed gasoline service station, convenience store, Chinese restaurant, leasing agreement, Dunkin Donuts’ franchising agreement with drive-thru: said leasing and franchising agreements to be acceptable to buyer. Sale subject to buyer being able to purchase all business supplies, including gasoline, from vendors of buyer’s choice.
These were all provisions that were not included in the listing agreement and make apparent that the referenced documents had not been presented to Patel. Marchione testified that he had no interest in providing owner financing and that the drive-thru was yet to be settled at the time of the offer. Furthermore, he disagreed with conditions relative to purchasing supplies, including gasoline, as well as other vendors of the buyer’s choice. Up to such point in time, the Trust had incurred additional expenditures in developing the property relating to infrastructure which had been installed in connection with the tying into the convenience store of a car wash which was situated on a portion of the Trust property which was not being sold. At around such time it was concluded by the Trust that it made more sense to sell the remaining parcels along with the parcel that was subject to the listing agreement, as one entity.
After the rejection of the Patel offer, Marchione conferred with Brenner and discussed marketing the entire site for a revised selling price of $5,500,000.00. For the first time, a detailed addendum to the listing agreement was prepared by the Trust’s attorney and submitted to Brenner. The detailed thirteen-page, single-spaced addendum deals with terms which would be required to be agreed upon in order to arrive at a binding agreement with a potential buyer. The addendum includes, inter alia, a reference that the proposed shopping center was being sold as a complete package *217 “. . . in its present state of construction.” The addendum describes the premises presently consisting of one building to be completed to house two retail/commercial stores or restaurant and a larger building to be occupied by a convenience store, gas station or office set up, a Dunkin Donuts franchise cart system and a second unit to be a Chinese restaurant. Also referenced is the transaction was subject to a Mutual Oil/gasoline distribution agreement which must be assumed by the buyer. Also addressed is the matter of payment for inventory, the transfer of a liquor license which was attached to the premises and multiple other conditions with the entire mall being offered for $5,500,000.00. Also contained in the document are provisions as to potential condominiumizing of the units, a scheduling of the lease agreements in effect which related to the premises and reference to various easements which were proposed to be granted to the buyer incidental to the transaction. Such addendum further required that the price for the sale of the property would increase as the seller made additional improvements to complete the proposed car wash for the subject site. .
On or about January 7, 2009, Marchione advised Brenner that Messias Pedro (“Pedro”) was interested in purchasing the property. Pedro was someone who Brenner did not know prior to this introduction. Thereafter, Pedro met with Brenner. At such time, Brenner had in his possession the aforementioned addendum to the listing agreement which neither Brenner nor Marchione had signed. Pedro verbally offered the sum of $5,000,000.00 and subsequently verbally raised his offer to $5,275,000.00. There is a dispute between the parties as to whether or not Pedro had ever verbally agreed to pay the asking price of $5,500,000.00 and then reneged as claimed by Marchione. Marchione claims that his brother, Nicola, was not agreeable to lowering the sale price to $5,275,000.00. A draft purchase and sale agreement listing a selling price of $5,275,000.00 was prepared by the Trust’s attorney, however, that agreement was never signed by either party and the Trust determined that it would not accept less than the asking price of $5,500,000.00 for the premises. There is no evidence in the summary judgment record that Pedro was willing to meet this price nor is there any evidence in the summary judgment record of any written offer to purchase or for that matter, any writing being submitted by Pedro in connection with the premises.
On February 4, 2009, the Trust, through Frank Marchione as trustee, sent Brenner a letter by certified mail stating in part:
Pursuant to today’s conversation, my brother and I have decided to terminate the Sell Agreement dated May 15, 2008. The termination includes all land, buildings and businesses. We appreciate your diligent efforts associated with this project; however we feel it is in our best interest to operate and develop the business/property at this time. In addition, since we are days away from opening the convenience store, we have many obligations, the most important of which is to the people who have committed to join our operating staff.
Looking forward if our position changes and we decide to once again market the property, we would be delighted to discuss the opportunity with you.
The summary judgment record fails to contain any evidence of a written response to such letter by Brenner nor does it contain evidence of the substance of the conversation referred to in the letter. The summary judgment record includes a MLS printout for the entire premises showing a listing price of $5,500,000.00. The listing references that the sale includes a new operational gasoline station, convenience store, and leases for two tenants, Dunkin Donuts and a Chinese restaurant. Also included in the listing is an adjacent site with plans for a fully automated car wash. The listing further states, “[a] third parcel is available with a full liquor license for future retail package store.” The listing notice indicates a listing date of May 15, 2008 and “off-market” date of 5/15/2009.
The defendants now move for summary judgment claiming that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law that they did not breach the listing agreement for the sale of the subject premises.
The plaintiffs have filed an opposition to the aforesaid motion for summary judgment and a cross motion for partial summary judgment alleging that there are no genuine issues of material fact as to the plaintiffs’ claims under Count III for a cancellation fee based upon defendants’ termination letter dated February 4, 2009.
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing parly’s claim or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of her case at trial. Flesner v. Technical Comm. Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
*218 The Status of the Listing Agreement
In Tristram’s Landing, Inc. v. Wait, 367 Mass. 622 (1975), the Supreme Judicial Court prospectively adopted certain rules which would govern a broker’s right to a commission. The court held that when a broker is engaged by an owner of property to find a purchaser for it, the broker earns a commission when: (a) he produces a purchaser ready, willing and able to buy on the terms fixed by the owner; (b) the purchaser enters into a binding contract with the owner to do so; and (c) the purchaser completes the transaction by closing the title in accordance with the provisions of the contract. If the contract is not consummated due to the lack of financial ability of the buyer or because of another default by him, there is no right to a commission from a seller. The court held however, that if the failure of completion of the contract results from the wrongful act or interference of the seller, the broker’s claim is valid and must be paid. Id. at 629.
The court observed that this rule could be easily circumvented by language in a purchase and sale agreement or in an agreement between a seller and broker and that in many states, a signed writing is necessary for an agreement to pay commission to a real estate broker, although there is no such requirement in Massachusetts. While the court suggested that legislative consideration might be appropriate, it declined to judicially legislate such a rule. [1]
In the case at bar, it is clear from the summary judgment record that the circumstances surrounding the premises initially listed with Brenner by virtue of the agreement of May 15, 2008 continued to evolve. This evolution was in the form of ongoing development of the premises by the seller, the ultimate leasing of a portion thereof, the execution of franchise agreements and finally, the additional listing of other parcels and assets.
On the face of the listing agreement there are numerous ambiguities. It describes at best, the skeletal frameworks of a potential transaction. Furthermore, it is clear that Brenner knew or, as a competent broker, should have known that the listing agreement did not contain all essential terms for a sale. The listing agreement fails to provide sufficient information to a prospective buyer as to precisely what was being sold and what conditions the sale was subject to. Neither side has offered parol evidence in order to explain the meaning and scope of the broker’s exclusive right to sell the property described as “gas station, C-store, Dunkin Donuts franchise operation, and Chinese restaurant; to be built at 240 Hartwell Street, Fall River, MA.” The listing agreement also fails to provide any description of the precise parcels which were included in the sale. On the face of the listing agreement, there is no indication as to the square footage of any of the operations proposed to being sold nor are there any plans or specifications describing what was to be built and when it would be completed. On its face, the subject listing agreement, due to its insufficiencies, is clearly an invitation for a lawsuit.
The holding in Tristram’s Landing requiring that the purchaser be procured on terms fixed by the owner and that the purchaser enter into a binding contract with the owner go hand in hand. It would be expected that the terms fixed by the owner would substantially correspond to the terms contained in the purchase and sale agreement. The skeletal agreement could not be expected to contain all of the necessary terms for this transaction. The record also raises the question of whether the terms and conditions of the original listing agreement were waived by the parties. It is clear that after the rejection of the second Patel offer an effort was made by the parties to provide a precise definition as to what was to be included in the sale. Also the scope of the property and other assets to be sold was substantially expanded resulting in a new selling price of $5,500,000.00. Brenner’s acceptance of such modification is evidenced by the MLS listing for the property at $5,500,000.00. The lengthy Addendum to Authorization to Sell which was prepared by the Trust’s counsel and provided to Brenner could be found to constitute an amendment to the terms of Brenner’s right to sell the premises, particularly in light of the fact that such terms were apparently used in the negotiations with Pedro.
Patel’s Offer of August 21, 2008
On August 21, 2008, Patel submitted to the Trust, through Brenner, his offer to purchase for $3,000,000.00. On its face, the offer to purchase fails to comply with the very limited terms contained in the listing agreement. In particular, it provides for owner or conventional bank financing. As previously referenced, at deposition, Brenner was asked as to his understanding of such term.
It means that the buyer can get his financing either commercially, through a bank, a conventional bank, or through the owner or any other iype of financing that is satisfactory to the buyer at 6.5% for $2,400,000.00.
Question: And if the buyer were unable to obtain financing in accordance with those terms, the buyer would not have an obligation to go forward with the purchase, would he?
Brenner’s Answer: That would depend on the content of the subsequent purchase and sale agreement
Question: And what do you mean by that Mr. Brenner?
Brenner’s Answer: I mean its customary that subsequent to an acceptance of this proposal two, attorneys would get involved, one for the buyer, one for the seller, and they would draft an approved purchase and sale agreement setting forth the conditions for the financing.
*219 The offer to purchase also states that the sale would include the completed gasoline service station, convenience store, Chinese restaurant, leasing agreement, Dunkin Donuts franchise agreement with drive-thru and car wash business with 120-foot tunnel car wash.
There is no reference in the listing agreement to a drive-thru being provided nor is there any reference in the listing agreement as to the car wash business.
Furthermore, the agreement is subject to “the execution of a mutually satisfactory purchase and sale agreement for the property which shall then become the agreement between the parties no later than August 28, 2008.” It is clear that even if the so-called offer to purchase were accepted that the contents thereof would not constitute a valid, enforceable and binding agreement. The circumstances in the case at bar are substantially dissimilar from those in the case of McCarthy v. Tobin, 429 Mass. 84 (1999), where the court noted that in order for the offer to purchase to serve as a binding contract, the facts must indicate an intent on the part of the seller and buyer to be bound by the terms of the offer to purchase. In McCarthy, the fact that the seller and buyer had agreed upon all the essential terms of the transaction and the offer to purchase reflected their intent to be bound by the offer to purchase. Id. at 88; see also Coldwell Banker/Hunneman v. Shostack, 62 Mass.App.Ct. 635, 639 (2004).
At best, the Patel offer to purchase, even if accepted, represented an invitation and acceptance of an offer to continue negotiating towards a purchase with either party being in the position to terminate the parties’ dealings if a purchase and sale agreement were not entered into.[2]
Brenner argues that because Marchione testified that he was not inclined to sell the property for $3,000,000.00 when the Patel offer was submitted, that such circumstance entitles him to a commission. This testimony does not save the day since the summary judgment record does not establish either of the first two criteria for the collection of a commission established by Tristram’s Landing, Inc. v. Wait, 367 Mass. 622 (1975).
Brenner further argues that the language of the listing agreement permits Brenner to potentially circumvent the requirements of Tristram’s Landing. The pertinent language of the listing agreement states:
In the event that a buyer is procured in accordance with the terms of this agreement, ready, willing and able to purchase the property, or if said property is sold or exchanged by the seller or any other person during the term of this agreement. . .
As noted in Tristram’s Landing, ordinarily when an owner of property lists it with a broker for sale, his expectation is the money for the payment for the commission will come out of the sale proceeds. Id. at 628. The Supreme Judicial Court has acknowledged that where brokers who have legitimate expectations that if they bring the parties together on mutually acceptable terms they would expect a commission. The court however concluded that a broker is in a better position than the seller to protect such expectations by including in the brokerage contract"... a provision that the broker is entitled to his commission when it produces a ready, willing and able buyer whom the seller, for whatever reason, refuses to accept.” Capezzuto v. John Hancock Mut. Life Ins. Co., 394 Mass. 399, 403-04 (1985). In the case at bar, the language of the listing agreement fails to contain any language that the broker is entitled to its commission where, after finding a ready, willing and able buyer, the seller, for whatever reason, refuses to accept.[3]
It is clear that the overly broad language of the subject listing agreement fails to contain the specific language exempting the broker from the Tristram’s Landing requirements. Furthermore, as previously stated, there is no evidence that a buyer was found on terms acceptable to the seller.
Also, Brenner’s claim for a commission fails since our courts have held that in order to take advantage of the Tristram’s Landing exception as to a seller thwarting the sale, the seller must have agreed to sell the property to the broker’s client and a binding purchase and sale agreement executed. Capezzuto v. John Hancock Mut Life Ins. Co., 394 Mass. 399, 402 (1985).
The Alleged Bad Faith of the Trust
Brenner alleges that the summary judgment record supports a claim that the sale of the subject premises was prevented by virtue of the bad faith actions of the Trust. The Supreme Judicial Court has held that liability to pay a commission may exist where:
[UJnethical conduct of the employer . . . results in preventing full performance by the broker although the benefit which the employer sought from the broker’s exertion is obtained by him . . . Unethical conduct or bad faith . . . means a purpose on the part of the defendant to obtain without payment a profit from the plaintiffs exertions . . . Bad faith exists where the employer revokes the broker’s authority or makes the sale through other means when the broker has performed all he has undertaken, or is plainly or evidently approaching success in his undertaking
Bonin v. Chestnut Hill Towers Realty Corp., 392 Mass. 58, 70 (1984), citing Kacavas v. Diamond, 303 Mass. 88, 92 (1939).
To establish liability on a theory of bad faith by the seller, the broker must, at the very least, show that he had produced a customer ready, willing and able to purchase on acceptable terms. Bump v. Robbins, 24 Mass.App.Ct. 296, 307 (1987). In the case at bar, Brenner has failed to establish that Patel was ready, willing and able to purchase the subject premises *220 upon acceptable terms to the Trust and furthermore, has failed to demonstrate that any conduct engaged in by the Trust constituted a bad faith attempt to obtain the payment of a profit from Brenner’s exertions. In the case at bar, the subject premises was not sold and was ultimately retained and operated by the Trust. The court therefore concludes, that there is no showing of bad faith in connection with the subject transaction or that there is any prospect of such a showing.
Brenner’s Claim of a Commission in Connection with Dealings with Pedro
It is undisputed that Pedro was introduced to Brenner by Marchione for the purpose of Brenner attempting to negotiate the sale of the subject premises to Pedro. The Trust does not argue that the mere fact of the subject introduction by the Trust somehow precludes the recovery of a commission but rather claims that Marchione was never willing to purchase the premises upon the terms established by the Trust as seller. As hereinabove indicated, the court can infer that the terms of the listing agreement were at least expanded at some point in time to include additional property with a total purchase price of $5,500,000.00. The summary judgment record establishes that while Frank Marchione considered accepting an asking price of $5,275,000.00 for the premises that his brother, Nicola, would not agree to the same and insisted upon an asking price of $5,500,000.00.
The summary judgment record is devoid of any written offer or any purchase and sale agreement signed by Pedro. There is no admissible evidence in the summary judgment record that Pedro ever accepted such terms or, for that matter, any other terms of purchase. Brenner argues that an intention on the part of the Trust to sell for $5,275,000.00 was manifested by the drafting of a purchase and sale agreement by the Trust’s attorney reflecting such amount as a purchase price. Even if both Frank Marchione and Nicola Marchione had considered such proposal, there is no evidence that they ever executed a writing which would have bound them to sell the property for such amount nor that the subject terms were ever accepted by Pedro. Even if the Trust considered lowering its asking price, until such terms were memorialized in writing and accepted by Pedro, the Trust was free to withdraw its offer to sell at a reduced price. The court thus concludes, even taking the evidence in the light most favorable to Brenner, that the summary judgment record fails to establish that Pedro was a buyer ready, willing and able to purchase the premises upon terms satisfactory to the Trust. Furthermore, there is no evidence of bad faith conduct by the Trust in the form of attempting to deprive Brenner of the fruits of his labor for the purpose of personal gain or profits by the Trust. To the contrary, it is undisputed that the Trust referred Pedro to Brenner for the purpose of having Brenner take the appropriate steps to bring the sale of the premises to fruition.
Brenner’s Claim of Breach of Listing Agreement by Termination Letter Dated February 4, 2009
Brenner argues that the February 4, 2009 termination letter did not provide the requisite thirty days stated in the parties’ agreement thus entitling Brenner Realtors to a commission of three percent (3%) of the listing price. The Trust alleges that in light of this court’s previous ruling denying a motion for real estate attachment based upon a claim of alleged premature termination that such ruling is the law of the case. The court concludes that such finding was only in the context of whether or not there was a substantial likelihood of success on the merits and does not constitute the law of the case. The court finds, notwithstanding the contentions of both sides, that there are genuine issues of material fact as to whether such letter was intended to constitute an immediate withdrawal of the subject premises from the market or whether it was intended to constitute compliance with the listing agreement with an understanding that it would continue to be listed for thirty days from the date of receipt thereof. There are also genuine issues of material fact as to whether or not there was a waiver of said thirty-day period even if the letter was intended to constitute immediate withdrawal and whether such alleged withdrawal from the market was accepted or acknowledged by Brenner in light of the continued listing of the premises. Lastly, the letter was issued after an alleged conversation between the parties and was not responded to which may support defendants’ claim that the letter was pursuant to the contract’s terms. These issues cannot be resolved on the basis of the record which is before this court.
ORDER
For the foregoing reasons, it is ORDERED that defendants’ motion for summary judgment be ALLOWED in part and that judgment enter in favor of the defendants on Counts I and II which counts are ORDERED to be DISMISSED. Defendants’ motion for summary judgment on Count III and plaintiffs’ motion for summary judgment on Count III are each DENIED.
The court ORDERS that defendants’ motion for summary judgment as to Count IV is ALLOWED with the exception of so much thereof as alleges bad faith in connection with the alleged premature termination of the listing agreement.

Agreements with real estate brokers continue to be exempt from G.L.c. 259, §7. Meredith & Grew, Inc. v. Worcester Lincoln, LLC, 64 Mass.App.Ct. 142, 152 (2005).

Patel’s affidavit to the effect that he was ready, willing and able to purchase is purely conclusory and speculative.

The court notes that the basic listing agreement appears to be an MLS form. The Greater Boston Real Estate Board agreement for exclusive nght to sell provides that a commission is due if “a buyer is procured ready, willing and able to buy said property or any part thereof, in accordance with the *221 price, terms and conditions of this agreement or such other price, terms and conditions as shall be acceptable to the seller, whether or not the transaction proceeds." (Emphasis added). Eno & Hovey, Real Estate §36.2.